# UNITED STATES DISTRICT COURT

**EASTERN** DISTRICT OF **CALIFORNIA**

## FILED

MAY 1 4 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

UNITED STATES OF AMERICA

v.

STEVEN ORTEGA SR., STEVEN ORTEGA JR.,
MARLA ORTEGA, MATT ORTEGA, MARCUS
WILLIAMS, ANTHONY GIARRUSSO, a.k.a
"Grom", JAY DUPEE, BROCK ENRICO, TODD
BECERRA, a.k.a "Todd Zembik", STEVEN
ADGATE, BRYAN SWIERS, KYLE SCHMIDT,
DUSTY BURGE, CHARLES ERICKSON, TRAVIS
OLIBAS, JAKE WESTERMAN, JUSTIN
MCMILLIAN, SHAWN THOMPSON, FREDERICK
LAURENS, JASON SIEGFRIED, RICHARD
SERRELL, KEVIN KUESTER, DEREK WINTERS,
RICHARD REYNOLDS, NICKOLAS PERRY,
JOSEPH MIRANTE, KEVIN KIRKPATRICK, and
REGINALD BELL

## CRIMINAL COMPLAINT

CASE NUMBER:

2 12 - MJ - 1 2 5    GGH

# SEALED

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about **January 1, 2011, continuing to on or about May 14, 2012**, in **San Joaquin** County and elsewhere, in the Eastern District of California defendants did,

‣ Conspire to manufacture, distribute and possess with intent to distribute, more than 1000 marijuana plants,

in violation of Title **21**, United States Code, Sections **846 and 841(a)(1)**.  I further state that I am a Special Agent with the Drug Enforcement Administration and that this complaint is based on the following facts:

‣ **See attached Affidavit of Rebecca Caceres**

**X**  Continued on the attached sheet and made a part hereof.

Signature of Complainant, REBECCA A.. CACERES,
Special Agent, Drug Enforcement Administration

Sworn to before me, and subscribed in my presence

May 14, 2012                                        at      Sacramento, California

Date                                                                         City and State

GREGORY G. HOLLOWS

**GREGORY G. HOLLOWS**

U.S. Magistrate Judge

Name and Title of Judicial Officer                      Signature of Judicial Officer

AFFIDAVIT OF REBECCA A. CACERES IN SUPPORT OF APPLICATION FOR
CRIMINAL COMPLAINT, ARREST WARRANTS, AND SEARCH WARRANTS

## AFFIDAVIT OF REBECCA A. CACERES IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT, SEARCH WARRANTS AND ARREST WARRANTS

### TABLE OF CONTENTS

Basis of Information for Search Warrants ........................................................................1

I. People to be Arrested and Places to be Searched ........................................................2

Violations.........................................................................................................................2

People to be Arrested .......................................................................................................2

Search Locations..............................................................................................................4

II. Facts Establishing Probable Cause:.............................................................................5

    A. Background ...............................................................................................................6

        1. Confidential Source Information .......................................................................6

            a) Confidential Source #1 (CS#1)................................................................6

            b) Confidential Source 2 (CS#2)................................................................8

            c) Confidential Source 3 (CS#3)................................................................9

    B. People to be Arrested ..............................................................................................13

        1.  Steven ORTEGA Sr...........................................................................................13

        2.  Steven ORTEGA Jr............................................................................................15

        3.  Marla ORTEGA..................................................................................................17

        4.  Matt ORTEGA....................................................................................................19

        5.  Marcus WILLIAMS............................................................................................20

        6.  Anthony GIARRUSSO (AKA "Grom")............................................................22

        7.  Jay DUPEE ........................................................................................................25

        8.  Brock Enrico ......................................................................................................27

        9.  Todd BECERRA (AKA: Todd ZEMBIK) .........................................................28

        10.  Steven ADGATE ..............................................................................................31

11. Bryan SWIERS ...................................................................................................33

12. Kyle SCHMIDT....................................................................................................34

13. Dusty BURGE .....................................................................................................35

14. Charles ERICKSON .............................................................................................36

15.  Travis OLIBAS ...................................................................................................38

16. Jake WESTERMAN .............................................................................................39

17. Justin McMILLIAN .............................................................................................40

18. Shawn THOMPSON.............................................................................................41

19. Frederick LAURENS............................................................................................42

20. Jason SIEGFRIED ...............................................................................................44

21. Richard SERRELL................................................................................................45

22. Kevin KUESTER ..................................................................................................48

23. Derek WINTERS ..................................................................................................50

24. Richard REYNOLDS.............................................................................................52

25. Nickolas PERRY ..................................................................................................54

26. Joseph MIRANTE ................................................................................................57

27. Kevin KIRKPATRICK............................................................................................58

28. Reginald BELL .....................................................................................................59

C. Places to be Searched ......................................................................................................60

(A-1) 2835 Reyes Lane, Tracy, CA .......................................................................64

(A-2) 20175 and 20154 Sherman Island E LE Road, Rio Vista, CA ...................65

(A-3) 2002 E. Home Street, Fresno, CA................................................................65

(A-4) 5125 Parks Avenue, Salida, CA...................................................................68

(A-5) 849 Emily Street, Mountain House, CA ......................................................69

(A-6) 500 Ridge Creek Lane, Patterson, CA  .......................................................71

(A-7)  9301 Morton Davis Drive, Patterson, CA..........................................72

(A-8)  470 W. Larch Road, Suite 1, Tracy, CA ["Growers Choice"]...................73

(A-9)  1800 La Corunna Place, Apartment A, Modesto, CA ................................76

(A-10)  2306 Alamo Ct., Tracy, CA ....................................................77

(A-11)  222 Tissot Drive, Patterson, CA ............................................79

(A-12)  2894 Funston Court, Tracy, CA ............................................80

(A-13)  1340 Thoroughbred Street, Patterson, CA ................................82

III.  What I Expect to Find.........................................................87

Data to be Seized .................................................................97

Retention of Image................................................................99

Inventory and Return .............................................................99

Conclusion and Order Sought......................................................99

Request to Seal....................................................................100

**Attachment "A" (A1 – A13)**

**Attachment "B"**

**Affidavit of Rebecca Caceres in Support of Application for Criminal Complaint, Search Warrants and Arrest Warrants**

I, Rebecca Caceres, being duly sworn, depose and state as follows:

1.      I am a Special Agent (SA) with the United States Drug Enforcement Administration (DEA) and have so been employed since June of 2005. I am presently assigned to the DEA Sacramento District Office. Prior to June of 2005, I was employed as Special Agent for the Bureau of Land Management from September 2001 to June 2005.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7), and I am empowered by law to conduct investigations and make arrests for offenses enumerated in Section 878, of Title 21, United States Code.

2.      I was trained as a DEA Special Agent at the DEA Academy, Quantico, Virginia. I received specialized training in the Controlled Substance Act, Title 21, United States Code, including, but not limited to, Sections 841(a)(1) and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations, respectively.  During the course of my duties as a BLM Special Agent, the majority of my case work revolved around outdoor marijuana cultivation on public lands.  As part of my duties as a DEA Special Agent, I have participated in investigations targeting individuals and organizations trafficking marijuana, heroin, cocaine, methamphetamine, and other controlled substances as defined in Title 21, United States Code, Section 801. I have been actively involved as a case agent in investigations and have interviewed cooperating defendants and confidential sources who were involved in narcotics trafficking.  I have performed enforcement related tasks such as executing federal search warrants involving indoor and outdoor marijuana cultivation sites, arrest warrants, utilizing confidential sources for gathering intelligence and the purchases of marijuana, and surveillance of suspects involved in cultivating and distributing marijuana.

**Basis of Information for Search Warrants**

3.      Since early 2011, the DEA, in conjunction with the Internal Revenue Service (IRS), the San Leandro Police Department, the San Joaquin County Metropolitan Narcotics Task Force

1  (METRO), the Contra Costa County Sheriff's Office (CCCSO), and the Tracy Police Department,

2  hereinafter referred to as the "Investigating Agencies", has been conducting a criminal investigation

3  of marijuana cultivation and distribution by a drug trafficking organization (hereinafter referred to as

4  "DTO" or "the DTO") associated with the "Grower's Choice Hydroponics" retail business.  The

5  information contained in this affidavit is based upon numerous sources that include, but are not

6  limited to: Confidential Sources' information, my review of investigative reports, my personal

7  observations and the observations of other law enforcement officers both state and federal who are

8  involved in this investigation, Pacific Gas and Electric (PG&E) and Turlock Irrigation District (TID)

9  subscriber and usage records combined with consultations with PG&E and TID revenue assurance

10  representatives, telephone subscriber and toll records, intercepted verbal and electronic

11  communications, surveillance by law enforcement, and the analysis of motor vehicle records.

12      4.      Because this affidavit is being submitted for the limited purpose of establishing

13  probable cause for securing search warrants for the described locations, I have not included each and

14  every fact known to me concerning this investigation.  I have set forth only the facts that I believe

15  are necessary and appropriate to establish probable cause for the warrant requested herein.

16  **I.      People to be Arrested and Places to be Searched:**

17  **Violations**

18      5.      This affidavit is made in support of an application for a criminal complaint and arrest

19  warrants for the individuals listed below for violations of Title 21, United States Code Sections 846

20  and 841(a)(1).  In addition, search warrants related to the Grower's Choice DTO are requested

21  regarding the locations described in Attachments A-1 through A-13 and to search for and seize

22  property that constitutes evidence of the commission of criminal offenses, the fruits of such crimes,

23  things otherwise criminally possessed, and property designed or intended for use or which is or has

24  been used as the means of committing the criminal offenses as described in Attachment B and

25  constitute violations of law under the following federal statutes:

26      1)      21 U.S.C. § 841(a)(1) – Manufacture, possess with intent to distribute, and

27              distribution of marijuana;

28

Affidavit of Rebecca Caceres                        2

2)  21 U.S.C. § 846 and 841(a)(1)- Conspiracy to manufacture and distribute marijuana;

3)  21 U.S.C § 856 – Maintaining a place for manufacture and distribution of marijuana;

4)  18 U.S.C. § 1956(h), Money Laundering Promotion of a Specified Unlawful Activity; and

5)  21 U.S.C. § 843(b) – Use of Communications Facilities to Commit, Facilitate, or Further an Act or Acts which Constitute a Felony.

**People to be Arrested:**

1.  Steven ORTEGA Sr.

2.  Steven ORTEGA Jr.

3.  Marla ORTEGA

4.  Matt ORTEGA

5.  Marcus WILLIAMS

6.  Anthony GIARRUSSO (AKA "Grom")

7.  Jay DUPEE

8.  Brock ENRICO

9.  Todd BECERRA (AKA: Todd ZEMBIK)

10.  Steven ADGATE

11.  Bryan SWIERS

12.  Kyle SCHMIDT

13.  Dusty BURGE

14.  Charles ERICKSON

15.  Travis OLIBAS

16.  Jake WESTERMAN

17.  Justin McMILLIAN

18.  Shawn THOMPSON

19.  Fredrick LAURENS

20.  Jason SIEGFRIED

Affidavit of Rebecca Caceres

3

1    21.    Richard SERRELL

2    22.    Kevin KUESTER

3    23.    Derek WINTERS

4    24.    Richard REYNOLDS

5    25.    Nickolas PERRY

6    26.    Joseph MIRANTE

7    27.    Kevin KIRKPATRICK

8    28.    Reginald BELL

9  **Search Locations**

10    (A-1)   2835 Reyes Ln, Tracy, CA

11    (A-2)   20154 and 20175 Sherman Island E Le Road, Rio Vista, CA

12    (A-3)   2002 E. Home St., Fresno, CA

13    (A-4)   5125 Parks Ave., Salida, CA

14    (A-5)   849 Emily St., Mountain House, CA

15    (A-6)   500 Ridge Creek Lane, Patterson, CA

16    (A-7)   9301 Morton Davis Dr., Patterson, CA

17    (A-8)   470 W. Larch Rd., Suite 1, Tracy, CA

18    (A-9)   1800 La Corunna Place, Apt. A, Modesto, CA

19    (A-10)  2306 Alamo Ct., Tracy, CA

20    (A-11)  222 Tissot Dr., Patterson, CA

21    (A-12)  2894 Funston, Tracy, CA

22    (A-13)  1340 Thoroughbred St., Patterson, CA

23

24    6.    There is probable cause to believe, as detailed in this affidavit, that evidence listed

25  and described in Attachment B resulting from violations enumerated in this affidavit, is presently

26  located in the residential and commercial properties listed above and more particularly described in

27  Attachments A-1 through A-13.

28

Affidavit of Rebecca Caceres                    4

1  **II.     Facts Establishing Probable Cause:**

2      7.     Based on intercepted calls and surveillance, I believe that the individuals listed in

3  paragraph 5 above are co-conspirators involved in a marijuana growing and trafficking organization,

4  the "Grower's Choice DTO." The organization is centered around the Growers Choice stores in

5  Hayward, CA and Tracy, CA, which are used to further the criminal activity of the Growers Choice

6  DTO. The Grower's Choice stores are believed to be owned and managed by ORTEGA Sr. and

7  Anthony WINTERS. ORTEGA Sr. is the husband of MARLA ORTEGA. They are the parents of

8  ORTEGA Jr. and Matt ORTEGA. It is believed that ANTHONY WINTERS and DEREK

9  WINTERS are also Marla ORTEGA's children. MICHELE WHITE ("WINTERS") is ANTHONY

10 WINTERS' wife. It is believed that ORTEGA Sr., ORTEGA Jr., and DUPEE are leaders in an

11 overall conspiracy to cultivate and distribute multiple pounds of marijuana in the Northern, Eastern,

12 and Central Districts of California.

13     8.     The Grower's Choice stores are involved in the provision of grow supplies, often on

14 credit, and in at least one identified case, the division of proceeds from a marijuana grow created

15 with fronted equipment. Probable cause also exists to believe that the business is also used to

16 launder proceeds from drug sales. ORTEGA Sr. is believed to be the leader in the overall

17 conspiracy to laundering marijuana proceeds through the Growers Choice business located in Tracy,

18 CA and Hayward, CA, and directs Anthony WINTERS, Marla ORTEGA, Derek WINTERS and

19 others in that money laundering conspiracy.

20     9.     ORTEGA Sr. is partnered with ERICKSON and THOMPSON to cultivate marijuana

21 at various locations. ORTEGA Sr. directs WESTERMAN, OLIBAS, and McMILLIAN to conduct

22 day-to-day activities in the cultivating and harvesting of marijuana. REYNOLDS works as a courier

23 or salesman for ORTEGA Sr. to distribute marijuana in the area of Los Angeles, CA. BURGE was

24 an identified assistant to ORTEGA Sr. to cultivate and assist in the distribution of marijuana.

25     10.    ORTEGA Jr. is partnered with GIARRUSSO and ADGATE to cultivate marijuana at

26 various locations. GIARRUSSO directs SCHMIDT, ENRICO, and LAURENS in the day-to-day

27 activities of cultivating marijuana. SIEGFRIED and PERRY were identified as a regular marijuana

28

1 | clone suppliers for ORTEGA Jr.

2 | 11.   ORTEGA Sr., ORTEGA Jr., and DUPEE also share members of the DTO for

3 | different roles.  MIRANTE was identified as a sub-distributor of marijuana for ORTEGA Sr. and a

4 | supplier of cloned marijuana plants for ORTEGA Jr.  KIRKPATRICK was identified as a source of

5 | supply of marijuana for ORTEGA Sr. and a distributor for ORTEGA Jr.  BECERRA was identified

6 | as a sub-distributor of marijuana for ORTEGA Jr. and DUPEE.  WILLIAMS and SERRELL were

7 | identified as sub-distributors of marijuana for ORTEGA Sr. and ORTEGA Jr.  BELL was identified

8 | as a sub-distributor of marijuana for ORTEGA Sr., ORTEGA Jr., and DUPEE.  KUESTER was

9 | identified as a clone supplier for ORTEGA Sr., ORTEGA Jr., and DUPEE.  SWIERS was identified

10 | as an electrician that assisted ORTEGA Sr., ORTEGA Jr., and DUPEE with the establishment and

11 | dismantlement of indoor marijuana grows.

12 | **A.  Background**

13 | **1.  Confidential Source Information**

14 | **a)  Confidential Source #1 ("CS#1")**

15 | 12.   In early 2011, agents met with a Confidential Source (hereinafter referred to as CS#1)

16 | regarding a drug trafficking organization centered around hydroponic equipment retailer "Grower's

17 | Choice Hydroponics."  CS#1 is cooperating with law enforcement for potential monetary gain.

18 | CS#1's criminal convictions includes: a) an August 2008 felony conviction for Maintaining a Place

19 | to Sell Controlled Substances; b) September 2008 felony convictions for Cultivating Marijuana and

20 | Maintaining a Place to Sell Controlled Substances; c) a 2011 misdemeanor conviction for Driving

21 | Under the Influence.

22 | 13.   CS#1 participated in a prior successful investigation and the information provided by

23 | CS#1 was proven to be reliable.  During this investigation, information provided by CS#1 has been

24 | corroborated and proven to be reliable, and I believe CS#1 to be reliable.

25 | 14.   CS#1 stated that Steve ORTEGA (hereinafter referred to as ORTEGA Sr.) and

26 | Anthony WINTERS (hereinafter referred to as WINTERS) co-own hydroponic equipment retailer

27 | "Grower's Choice Hydroponics," also known as "Hayward GC, LLC" and "Tracy GC, LLC,"

28 |

Affidavit of Rebecca Caceres                6

1  (hereinafter all referred to as "Grower's Choice") with store locations (in late 2010) in San Leandro

2  and Tracy, California (In 2011, the San Leandro store moved to Hayward, California). Investigating

3  Agencies confirmed with California Secretary of State business registration records that "Hayward

4  GC, LLC" is registered to: Steven ORTEGA, **6602 Village Dr., Livermore, California**; and "Tracy

5  GC, LLC" is registered to: Marla ORTEGA (ORTEGA Sr.'s wife), 470 W. Larch Rd. #1, Tracy,

6  California. In May 2012, intercepted calls revealed that ORTEGA Sr., and other family members,

7  purchased a hydroponic equipment supplier in Modesto, California which intentions to name it

8  Modesto GC LLC. CS#1 believed that ORTEGA Sr. also owned "Trendsetterz Custom Cycles,"

9  motorcycle shop (hereinafter referred to as "Trendsetterz") located in Byron, California. I attempted

10  to locate the Trendsetterz business using multiple name variations with California Secretary of State

11  records, but was unable to find it registered. However, multiple intercepted telephone calls and

12  surveillance observations have confirmed that this shop appears to be owned and/or operated by

13  ORTEGA Sr. and/or Steve ORTEGA Jr.

14      15.    CS#1 explained that ORTEGA Sr., his son Steve ORTEGA (Jr.)(hereinafter referred

15  to as ORTEGA Jr.), Anthony WINTERS, several employees of Grower's Choice, and others, were

16  engaged in large-scale indoor-marijuana cultivation using multiple residences as grow-houses in

17  Contra Costa, Alameda, San Joaquin, and Stanislaus counties in California. CS#1 believed that

18  proceeds from sold marijuana are being funneled into the Grower's Choice business in order to

19  launder the money. CS#1 believed that none of the marijuana cultivated by the DTO is being grown

20  for medicinal reasons.

21      16.    Regarding drug proceeds, CS#1 stated that a couple of years ago, WINTERS had told

22  CS#1 that WINTERS had accumulated approximately one million dollars by the age of 30, which

23  CS#1 understood to believe were drug proceeds based on the context of the conversation. CS#1

24  continued saying WINTERS explained to CS#1 that WINTERS uses the hollow space within large

25  toilet bowls to conceal drug proceeds. Based on CS#1's own observations of WINTERS' and

26  others' use of a concealed space in the office of the old Grower's Choice store (in San Leandro) to

27  hide personal amounts of marijuana, CS#1 believes that some members of this DTO are likely to

28

Affidavit of Rebecca Caceres                    7

1  conceal drugs and drug proceeds in hidden areas.

2      17.     Early in 2011, CS#1 communicated to your affiant that the DTO had stopped

3  trafficking in marijuana. However, when I questioned CS#1 about this statement, he/she stated that

4  the DTO had not stopped, but that he/she had made that declaration out of frustration with unrelated

5  issues. Despite this statement and subsequent recantation, I believe that CS#1 is reliable and his/her

6  information has been corroborated as accurate.

7          **b)    Confidential Source #2 ("CS#2")**

8      18.     In early 2011, investigators began to meet with a Confidential Source (hereinafter

9  referred to as CS#2), who has had a social relationship with ORTEGA Jr., ORTEGA Sr., other

10  ORTEGA family members, and other ORTEGA family associates for many years. CS#2's

11  information has proven to be reliable and has been corroborated by independent evidence. I believe

12  CS#2 is reliable. CS#2 is cooperating with law enforcement for potential monetary gain. CS#2's

13  criminal convictions includes: a) a 1994 misdemeanor for Burglary; b) a 1998 felony conviction for

14  Grand Theft; c) a 2006 felony conviction for Marijuana Cultivation.

15      19.     CS#2 also stated that ORTEGA Sr., WINTERS, and others, were involved in indoor-

16  marijuana cultivation, and that the Grower's Choice business was being used. CS#2 stated that the

17  Grower's Choice business appeared to struggle financially for the first few years after opening.

18  CS#2 stated that in the 2005-2006 timeframe, ORTEGA Sr. and WINTERS began to accumulate a

19  significant amount of money and assets. Around that same time, CS#2 learned directly from

20  conversations with ORTEGA Sr., that ORTEGA Sr. and WINTERS were engaged in indoor-

21  marijuana cultivation. CS#2 later learned that the strain of marijuana grown by the DTO was called

22  "bubba kush." CS#2 also learned that the DTO was using the Grower's Choice business to recruit

23  people willing to grow marijuana in exchange for provided equipment and profit-sharing. CS#2

24  learned that the DTO maintained marijuana-grows in Contra Costa, San Joaquin, and Stanislaus

25  counties of California. CS#2 stated that Grower's Choice employees "Hetch," "Siegfried," and

26  "Derek" (later identified as Michael HETRICK, Jason SIEGFRIED, and Derek WINTERS) were all

27  aware of, and/or members of the indoor-marijuana operation led by ORTEGA Sr., ORTEGA Jr., and

28

1   WINTERS. CS#2 additionally named Matt ORTEGA, Kevin KIRKPATRICK, Michael KELLEY,

2   Nicholas PERRY, "Joey" (later identified by CS#2 as Joey FIGLIA), and others as likely DTO

3   members or partners engaged in marijuana cultivation and distribution.

4        20.    CS#2 explained that the DTO has many marijuana cultivation sites, most of which are

5   in partnership with the hands-on cultivator. CS#2 said that the DTO is providing capital and/or free

6   marijuana cultivation equipment to DTO members, to include store employees, friends, family, and

7   trusted customers; the investment is in exchange for a reimbursement of any initial capital and a

8   share of harvested marijuana. As a personal example, CS#2 stated that several years ago, ORTEGA

9   Jr. asked CS#2 if CS#2 was interested in a marijuana profit-sharing partnership. CS#2 was asked by

10  ORTEGA Jr. if he/she would like to be the caretaker for an indoor-marijuana cultivation in which

11  ORTEGA Jr. offered to provide cultivation equipment in exchange for sharing the marijuana yield

12  50/50. Ultimately, CS#2 did not accept the offer and a deal was never entered into with ORTEGA

13  Jr.

14       21.    More recently, CS#2 stated that he/she saw multiple pounds of marijuana in October

15  2011, which a friend of WINTERS said he (the friend) had recently bought from WINTERS for

16  $3,100 per pound and that he (the friend) picked up from WINTERS at the **Grower's Choice store**

17  **in Hayward, California**.

18                      **c)   Confidential Source #3 ("CS#3")**

19       22.    In early 2011, DEA agents began interviewing a cooperating defendant (hereinafter

20  referred to as CS#3) who agreed to cooperate in exchange for consideration on pending charges

21  detailed below. CS#3's information has proven to be reliable and has been corroborated by

22  independent evidence. I believe CS#3 is reliable. In 2010, CS#3 was arrested for felony Conspiracy

23  to Distribute a Controlled Substance (marijuana), and felony Possession of a Controlled Substance

24  (marijuana). CS#3's criminal convictions includes: a) a 2007 felony conviction for Maintaining a

25  Place to Sell Controlled Substances (marijuana); and b) a 2009 misdemeanor conviction for Reckless

26  Driving.

27       23.    In 2011, CS#3 stated to your affiant that he/she learned over several years of social

28

1   contact with ORTEGA Sr., ORTEGA Jr., WINTERS, and others including Grower's Choice

2   employees, that they are engaged in marijuana cultivation and distribution. Further, CS#3 stated that

3   he/she had personally seen two indoor-marijuana grow-sites managed by ORTEGA Sr., ORTEGA

4   Jr., and Grower's Choice employee Chris DIAS in 2010. CS#3 believed the group was involved in

5   marijuana cultivations in multiple Northern California counties and was transporting large quantities

6   of marijuana for sale out of the area.

7        24.    CS#3 also provided information regarding money laundering at Grower's Choice. In

8   2008, CS#3 had conversations with WINTERS in which CS#3 was propositioned to open a new

9   Grower's Choice store as a partner. CS#3 learned from WINTERS that he (WINTERS) and partner

10  ORTEGA Sr. filter proceeds from the sale of marijuana into the **Grower's Choice business**. CS#3

11  further learned from WINTERS that Grower's Choice's internal business records were falsified in

12  the effort to conceal laundered drug proceeds. CS#3 explained that the business had to pay taxes on

13  laundered drug proceeds as a result, but that it was worth it to avoid detection from law enforcement.

14  WINTERS told CS#3 that they (WINTERS and others) liked to keep their operations basic because

15  it was easier to "cook the books," believed to mean the manipulation of sales records. According to

16  CS#3, WINTERS continued to say that having a digital system would make it more difficult to filter

17  drug proceeds into the business. CS#3 said that WINTERS suggested that CS#3 could duplicate the

18  money laundering system used at Grower's Choice if CS#3 was willing to be a partner and open a

19  Grower's Choice store. Ultimately, CS#3 chose not to partner with WINTERS and ORTEGA Sr.

20              **2.   Initiation of Title III Intercepts**[1]

21       25.    On October 28, 2011, the Honorable Morrison C. England Jr., United States District

22  Judge for the Eastern District of California, issued an order authorizing the interception of wire

23

24  1 Title III intercepts technically capture call data (voices, numbers, times, etc.) and not the individual. The
    user of the phone has been established during the investigation by one or more of the following methods: (1) a
25  ruse call by law enforcement agents which is done by an agent calling the phone and watching in real-time the
    user of the phone answer the call; (2) statements of intended future conduct intercepted from phone calls,
26  which conduct is then observed by surveillance and makes a positive identification of the person engaging in
    that conduct; (3) by names used in the course of intercepted calls and subsequent voice recognition; or (4)
27  subscriber information on the phone matching referenced names or subsequent voice recognition (the term
    voice recognition as used throughout this affidavit refers to the recognition of a voice by a listener and not a
28  computerized or technical process).

1   communications over telephone number (209) 996-1225, hereinafter referred to as **Target**

2   **Telephone #1 (TT#1)**, which was used by ORTEGA Jr.  This intercept began on October 29, 2011

3   and terminated 30 days later and was supported by ground and air surveillance.  Hundreds of

4   communications related to marijuana trafficking were intercepted between ORTEGA Jr. and others.

5         26.     On January 12, 2012, the Honorable Morrison C. England Jr., United States District

6   Judge for the Eastern District of California, issued an order authorizing the interception of wire and

7   electronic communications (text messages) over **Target Telephone #1** (209) 996-1225, used by

8   ORTEGA Jr., **Target Telephone #2 (TT#2)** (209) 495-7328, used by ORTEGA Sr., and **Target**

9   **Telephone #3 (TT#3)** (925) 727-1112, used by co-conspirator Anthony GIARRUSSO. These

10  intercepts began on January 12, 2012 and terminated 29 days later.  The intercepts were supported

11  by ground and air surveillance.  Hundreds of communications related to marijuana trafficking were

12  intercepted between ORTEGA Sr., ORTEGA Jr., and/or GIARRUSSO, and others.  Further, I

13  estimate that in 29 days of interception, ORTEGA Sr. was responsible for the sale of approximately

14  65-70 pounds of marijuana, earning himself and his partners proceeds of approximately $210,000 or

15  more.

16        27.     On April 3, 2012, the Honorable Morrison C. England Jr., United States District

17  Judge for the Eastern District of California, issued an order authorizing the interception of wire

18  and/or electronic communications over **Target Telephone #2** (209) 495-7328, used by ORTEGA

19  Sr., **Target Telephone #4 (TT#4)** (925) 813-0570, used by ORTEGA Jr., **Target Telephone #5**

20  **(TT#5)** (925) 265-3057 (only wire interception), used by ORTEGA Sr., and **Target Telephone #6**

21  **(TT#6)** (925) 605-6080, which is used by ORTEGA Sr.'s wife Marla ORTEGA (hereinafter referred

22  to as MARLA).  These intercepts began on April 3, 2012 and terminated on May 3, 2012.  The

23  intercepts were supported by ground and air surveillance.  Hundreds of communications related to

24  marijuana trafficking were intercepted between ORTEGA Sr., ORTEGA Jr., and/or MARLA, and

25  others.

26        28.     Intercepted telephone conversations took place in English.  All calls used in this

27  affidavit are in synopsis form.  In general, intercepted conversations about drug-trafficking were

28

1  easily understood because they were not coded.  Phrases and words used by the DTO were largely
2  already known to monitors and agents.  Examples of known words intercepted include, "work,"
3  referring to marijuana (or drugs in general), "P," referring to pounds, "zip," referring to ounce, and
4  numbers referring to dollar amounts or quantities of marijuana plants or processed marijuana.

5      29.      Based on the interception of voice and electronic communications, corresponding
6  surveillance, confidential source information and other evidence, I believe that Steven ORTEGA Sr.,
7  Steven ORTEGA Jr., Marla ORTEGA, Matt ORTEGA, Marcus WILLIAMS, Anthony
8  GIARRUSSO, Jay DUPEE, Brock ENRICO, Todd BECERRA, Steven ADGATE, Bryan SWIERS,
9  Kyle SCHMIDT, Dusty BURGE, Charles ERICKSON, Travis OLIBAS, Jake WESTERMAN,
10  Justin McMILLIAN, Shawn THOMPSON, Frederick LAURENS, Jason SIEGFRIED, Richard
11  SERRELL, Kevin KUESTER, Derek WINTERS, Richard REYNOLDS, Nickolas PERRY, Joseph
12  MIRANTE, Kevin KIRKPATRICK, Reginald BELL, and others not named, are participants in the
13  conspiracy to cultivate and/or distribute marijuana in which the co-conspirators assist, broker, buy
14  from or supply to assist in cultivation, and facilitate aspects of marijuana trafficking with one
15  another.  Each of the above named individuals was intercepted in one or more calls believed to be in
16  furtherance of the criminal activities of the DTO.  Due to their access to cultivation equipment and
17  supplies, the focal point of this DTO is the related ORTEGA and WINTERS family members and
18  their Grower's Choice businesses.  ORTEGA Sr. and ORTEGA Jr. are DTO leaders, frequently
19  directing others on DTO activities.  Further, it appears that cultivation equipment and supplies are
20  being provided by the Grower's Choice business, likely at a discount or in partnership with the
21  marijuana-grow caretakers.  Intercepted calls suggested that some of this equipment is being paid for
22  long after it was provided, with drug proceeds from marijuana sales.  In at least one instance, the
23  division of proceeds is based on a portion of the marijuana derived from a specific number of
24  marijuana grow lights.  Because some of the DTO members are drawing a paycheck from Grower's
25  Choice, I believe this pattern of individuals paying for equipment used to grow marijuana with drug
26  proceeds from the sale of grown marijuana, while receiving a paycheck from that same business, is a
27  method of money laundering.  This is particularly so with the business operators, ORTEGA Sr.,

28

1  Anthony WINTERS, and MARLA, who receive a substantial salary from the business. Also, it was
2  revealed that ORTEGA Sr., ORTEGA Jr., and others, were spending some of their drug proceeds on
3  high-value assets such as vehicles and jewelry. Further, it was revealed that some DTO members
4  made efforts to conceal the purchase and ownership of assets. I believe this was done because assets
5  were purchased with drug proceeds.

6       30.    The above named individuals are believed to assist and participate in the cultivation
7  and distribution of marijuana and further a conspiracy to cultivate and distribute marijuana
8  specifically within the Eastern and Northern Districts of California. This affidavit also requests
9  search warrants for places associated with this conspiracy in the Eastern District of California.
10  Similarly, a second affidavit has been drafted and submitted in the Northern District of California
11  requesting additional search warrants for places associated with this conspiracy that are located in
12  the Northern District.

13          **B. People to be Arrested**

14               **1.   Steven ORTEGA Sr.**

15       31.    As illustrated through court-authorized wire interceptions on TT#2 and TT#5 and
16  information provided by CS-1 through CS-3, Steven ORTEGA Sr. has been identified as being
17  involved in the cultivation and distribution of marijuana.[2] Based on intercepted calls and
18  surveillance, it is believed that ORTEGA Sr. has multiple partnerships with other co-conspirators to
19  further indoor growing operations.

20       32.    Surveillance by law enforcement showed that ORTEGA Sr. resides at 4100 Bixler
21  Road, Byron, CA located in the Northern District of California. ORTEGA Sr. has the following
22  criminal convictions: a) in 2011, misdemeanor conviction for carrying a concealed weapon in a
23  vehicle and misdemeanor conviction for reckless driving.

24       33.    On April 17, 2012, ORTEGA Sr. made an outgoing call to (702) 619-0454 (used by
25  SERRELL). During this call, SERRELL asked ORTEGA Sr. what he needed to pay. ORTEGA Sr.
26  replied that he could get "three all day long right now," meaning $3,000 per pound. ORTEGA Sr.

27
28  ---
2 DEA is aware that ORTEGA Sr. was the user of TT#2 and TT#5 based on surveillance, and subsequent wire
intercepts, i.e. monitors recognizing his voice and nicknames/names.

continued that if he "hustled in L.A. I could probably get 33," meaning, if ORTEGA Sr. sold the marijuana in Los Angeles, CA ORTEGA Sr. could sell the marijuana for $3,300 per pound. ORTEGA Sr. stated he that would give them all to SERRELL for "three" if SERRELL wanted. SERRELL asked ORTEGA Sr. when it would be ready. ORTEGA Sr. explained that he was going to check them right then and "I should have 50 or better." I believe that SERRELL wanted to purchase pound quantities of marijuana from ORTEGA Sr. I believe ORTEGA Sr. told SERRELL that he would have approximately 50 pounds or more that ORTEGA Sr. would sell to SERRELL for $3,000 per pound.

34.     On April 18, 2012, ORTEGA Sr. made and received incoming and outgoing calls to and from (925) 337-0127 (used by SWIERS). During these calls, SWIER told ORTEGA Sr. that he needed someone to take his "shit to dry," meaning recently harvested marijuana that had not dried out. SWIERS continued that he needed to get it out of his house that night because he had been "trimming" and SWIERS thought his neighbor had called the "cops" because the "Sheriff showed up." ORTEGA Sr. called SWIERS back and stated that the only safe place he knew about was down in "Fresno," likely to mean the warehouse located at 2002 E. Home St., Fresno, CA. ORTEGA Sr. explained that the last time ORTEGA Sr. put it in his shop the whole place "stunk." Based on my experience, the odor of marijuana has a strong pungent skunk musk smell. ORTEGA continued that "Shawn's" [THOMPSON] house was available, but not many people trusted THOMPSON. ORTEGA Sr. stated that ORTEGA Sr.'s was there, but no one could get in because only ORTEGA Sr. had the key.

35.     I believe that SWIERS told ORTEGA Sr. that while SWIERS had been "trimming" harvesting the marijuana at SWIERS house, SWIERS believed that his neighbor had called the law enforcement about SWIERS growing and harvesting marijuana. I believe that SWIERS had hoped ORTEGA Sr. would help SWIERS hide the marijuana temporarily until it dried and SWIERS could sell it. I believe that ORTEGA Sr. explained to SWIERS that ORTEGA Sr. had a safe place at the warehouse in Fresno, CA where ORTEGA Sr. was growing marijuana, but it was a long way away. I believe that ORTEGA Sr. stated that ORTEGA Sr. hid marijuana at THOMPSON's house.

## 2.   **Steven ORTEGA Jr.**

36.     As previously illustrated through court-authorized wire interceptions on TT#1 and TT#4 and information provided by CS-1 through CS-3, Steven ORTEGA Jr. has been identified as being involved in the cultivation and distribution of marijuana.[3]     Surveillance by law enforcement showed that ORTEGA Jr. resides at 3062 Castle Rock Loop, Discovery Bay, CA located in the Northern District of California.  ORTEGA Jr. has the following criminal convictions: a) in 2009, Misdemeanor conviction for Assault with a deadly weapon (not a firearm) and Misdemeanor conviction for Reckless Driving.

37.     Intercepts between January 31, 2012 and February 1, 2012 revealed that an indoor marijuana growing operation exists at 1228 S. Berkley Ave., Turlock, CA.  This operation was tended to by Rodrigo GALVAN and Todd HENDERSON and managed by Anthony GIARRUSSO and ORTEGA Jr.  The following calls detail the possible robbery of the marijuana grow, which had been located at 1228 S. Berkley Ave., Turlock, CA:

38.     On January 31, 2012, ORTEGA Jr. received an incoming call from (209) 277-3171 (used by GALVAN).  During this call, GALVAN asked ORTEGA Jr. if he could send at least "three people where he was at."  GALVAN continued that he had received a tip that some people were going to "hit it," meaning to burglarize.  ORTEGA Jr. asked if it was "our place."  GALVAN responded "ya."  GALVAN explained that he did not know who or why, but that it was going to take place that night or the next day.  Based on my training and experience investigating marijuana offenses, I know that marijuana grow houses are frequently targeted for burglary because of the value of the marijuana and the reluctance of the owners of the marijuana grows to report the robberies to the police.

39.     Later that same day, ORTEGA Jr. received an incoming call from (209) 345-5279 (used by Tim LNU).  During this call, ORTEGA Jr. asked if Tim LNU knew of any people in the area that would go around robbing people.  Tim LNU responded that he had not.  ORTEGA Jr. said

---

[3] DEA is aware that ORTEGA Jr. was the user of TT#1 and TT#4 based on surveillance, and subsequent wire intercepts, i.e. monitors recognizing his voice and nicknames/names.  Also, ORTEGA Jr. provided CS-2 his telephone number, which was identified as TT#1's number.

1    that one of his guys had been followed by some people and that those people were going to "hit that
2    house the following night." ORTEGA Jr. stated that if it came down to it that he was going to "hunt
3    them down." ORTEGA Jr. explained to Tim LNU that his house was located near Golden State near
4    a junk yard. From ORTEGA Jr.'s description of where the grow house was located and previous
5    surveillances, it was determined that the grow site ORTEGA Jr. spoke of was at 1228 S. Berkley
6    Ave., Turlock, CA. I believe that ORTEGA Jr. attempted to discover who may have been planning
7    on robbing the marijuana growing operation that ORTEGA Jr. managed.

8          40.    On February 1, 2012, ORTEGA Jr. received an incoming call from (209) 345-5279
9    (used by Tim LNU). Tim LNU asked ORTEGA Jr. if he had a late night. ORTEGA Jr. said he had
10   camped out all night with five other "mother fuckers that were ready." I believe that ORTEGA Jr.
11   told Tim LNU that he and five other people stayed at 1228 S. Berkeley Ave. ready to fight anyone
12   that attempted to steal their marijuana. Based on previous calls with GIARRUSSO and SCHMIDT,
13   I believe that ORTEGA Jr. and the additional five people were armed with firearms.

14         41.    A TID record check on April 26, 2012 revealed Todd HENDERSON as the TID
15   utility subscriber at 1228 S. Berkeley Ave. since August 4, 2009 for the residence and December 5,
16   2011 for the "shop" located on the same property. According to TID, 1228 S. Berkeley Ave. had a
17   power usage indicative of a large indoor marijuana garden in the location identified by TID as being
18   the "shop" with usage rates averaging 22 kilowatts/hour during the winter months between October
19   2011 and February 2012. Specifically in January 2012, when HENDERSON was on service, the
20   average usage rate was 28 kilowatts/hour. In January 2011, when the previous person was on
21   service (1992 to July 5, 2011), the average usage rate was 1.1 kilowatts/hour. In March 2012, the
22   electrical usage dropped to 3 kilowatts/hour. In April 2012, the electrical usage dropped to .18
23   kilowatts/hour.

24         42.    According to TID records, the monthly bill amount for the "shop" in July 2011 was
25   $300.00. Starting in August 2011 through the March 2012, the monthly TID bill increased to an
26   average of $2,000.00. The highest TID bill was $3,020 in October 2011.. The last bill in April 2012
27   was for $188.00.

28

Affidavit of Rebecca Caceres                    16

1    43.    Based on the intercepted calls mentioned above, I believe that the electrical usage

2  dropped after February because ORETEGA Jr. and others were afraid that someone would break

3  into the shop and steal the marijuana that had been cultivating there. I believe that after the harvest

4  ended in February, ORTEGA Jr. et al decided not to grow marijuana at this location in the future.

5    44.    Additionally, there were intercepted calls on January 21, 2012 that involved

6  ORTEGA Jr. and WILLIAMS brokering the sale of 11 pounds of marijuana where ORTEGA Sr.

7  was the source of supply and the seizure of the 11 pounds.[4]

8  ### 3.    Marla ORTEGA

9    39.    As previously illustrated through court-authorized wire interceptions on TT#6 and

10  surveillance, Marla ORTEGA has been identified as being involved in the conspiracy to cultivate

11  and distribute marijuana with ORTEGA Sr. and Matt ORTEGA.[5]  Based on observations by law

12  enforcement officers and intercepted calls, I believe that Marla ORTEGA is involved in the

13  laundering of proceeds from the sale of marijuana through the Growers Choice Hydroponics stores.

14  Surveillance by law enforcement showed that Marla ORTEGA resides at 4100 Bixler Road, Byron,

15  CA. Marla ORTEGA has no known criminal history.

16    40.    The following intercepted call describes a "share cropping" scheme involving

17  members of the GROWERS CHOICE DTO. The scheme involves providing indoor marijuana

18  growing equipment without initial payment until an initial crop is harvested and distributed.  Part of

19  that profit is then put back into the Growers Choice Hydroponics store to pay back equipment costs

20  and an additional payment is paid to the owner(s).

21    41.    On January 30, 2012, ORTEGA Sr. made an outgoing call to (925) 605-6080 (used

22  by Marla ORTEGA). During this call, ORTEGA Sr. asked Marla ORTEGA if she was "letting Matt

23  [Matt ORTEGA] get more shit at the store." Marla ORTEGA said no, "I'm paying for that stuff.

24  But they better not burn me on that room." ORTEGA Sr. asked, "What deals did they make?"

25  Marla ORTEGA replied, "He's doing the original fucking deal that we said. The original deal … I

26

27  4 Refer to paragraphs 52-56, which detail the events of January 21, 2012 and the seizure of 11 pounds of marijuana.
   5 DEA is aware that Marla ORTEGA was the user of TT#6 based on surveillance, and subsequent wire intercepts, i.e.
28  monitors recognizing her voice and nicknames/names.

Affidavit of Rebecca Caceres

1 get eight lights." ORTEGA Sr. said, "They pay everything the first time and give you eight lights."
2 Marla ORTEGA agreed.  ORTEGA Sr. asked, "Then you don't get no more?"  Marla ORTEGA
3 agreed and said she didn't care because it was a "one-time deal."  ORTEGA Sr. said, "He called,"
4 and he's getting three trays and ten lights.  After this call, Matt ORTEGA and WESTERMAN were
5 observed loading equipment from the Grower's Choice store in Hayward, and going to 1565 Buena
6 Vista, Livermore, CA, where they unloaded the equipment.

7 42.    I believe equipment was taken from the Grower's Choice store in Hayward, CA as
8 part of a scheme to cultivate marijuana and share the yield and/or drug proceeds.  I believe Marla
9 ORTEGA described an agreement she made with Matt ORTEGA and Jacob WESTERMAN to
10 provide them with cultivation equipment in exchange for the marijuana yield from eight grow-lights
11 (Based on my training and experience that would equal approximately eight to 12 lbs. of marijuana
12 per harvest cycle valued at approximately $30,000) and a reimbursement of the equipment costs
13 when Matt ORTEGA and WESTERMAN obtain proceeds from their first harvest.

14 43.    The following intercepted call highlights the partnership between Marla ORTEGA
15 and ORTEGA Sr. and their involvement with the cultivation of marijuana:

16 44.    On April 27, 2012, ORTEGA Sr. made an outgoing call to (925) 605-6080 (used by
17 Marla ORTEGA).  During this call, Marla ORTEGA told ORTEGA Sr. that she could not believe it
18 cost that much to setup a "spot," meaning an indoor marijuana growing operation, plus pay
19 ORTEGA Sr.'s bills.  Marla ORTEGA stated that ORTEGA Sr. had "44 pounds" that was
20 "$123,000," meaning ORTEGA Sr. sold 44 pounds of marijuana for $123,000, and had "$2,000 in
21 bills at the shop" (shop in this context refers to Growers Choice Hydroponics store] and had to pay
22 some people to do some work.  Marla ORTEGA said "you guys" ORTEGA Sr. and others probably
23 ended up with "100 grand," likely $100,000 in drug proceeds.  ORTEGA Sr. told Marla ORTEGA to
24 look in the drawer and count what was there and that was what ORTEGA Sr. ended up with.  Marla
25 ORTEGA said, "I want my part in my hand, if it is 5,000, whatever it is."  ORTEGA Sr. stated that
26 when he got home, ORTEGA Sr. would divide every dollar and give Marla ORTEGA half.  Marla
27 ORTEGA replied that she wanted ORTEGA Sr. to "first pay whatever you need for Shawn

28

1  [THOMPSON] and then when we are done then we'll split it."  Marla ORTEGA said she did not

2  want to ask ORTEGA Sr. every time she needed money.  ORTEGA Sr. responded that Marla

3  ORTEGA did not need to ask him for money because she had a "bank full of money too."  Marla

4  ORTEGA said that she was not going to take out of "savings."  I believe that Marla ORTEGA is

5  supposed to be an equal partner in the cultivation and distribution of marijuana with ORTEGA Sr.,

6  but Marla ORTEGA felt she was not receiving an equal share of the proceeds.

7  ### 4.    Matt ORTEGA

8      45.     Based on observations by law enforcement officers and intercepted calls, I believe

9  that Matt ORTEGA is involved in the cultivation of multiple pounds of marijuana.  Surveillance by

10  law enforcement and intercepted calls showed that Matt ORTEGA resides at 4100 Bixler Road,

11  Byron, CA located in the Northern District of California.  Matt ORTEGA has no known criminal

12  history.

13      46.     The following series of events that occurred on April 21, 2012, include an intercepted

14  call between Matt ORTEGA and ORTEGA Sr. where Matt ORTEGA brokered the sale of 30

15  pounds of marijuana that was later seized by Law Enforcement:

16      47.     On April 21, 2012, ORTEGA Sr. received an incoming call from (925) 216-8052

17  (used by Matt ORTEGA).  During this call, ORTEGA Sr. asked Matt ORTEGA how much "he" [an

18  unknown third party] gave him.  Matt ORTEGA stated "92," meaning $92,000.  ORTEGA Sr. asked

19  Matt ORTEGA how much "he" took.  Matt ORTEGA replied "30," meaning 30 pounds of

20  marijuana, but Matt ORTEGA had to get rid of someone else's first.  ORTEGA Sr. asked "how

21  many did I sell."  Matt ORTEGA responded "ten," meaning ten pounds of marijuana.  Matt

22  ORTEGA continued that he was trying to get "B" [unknown third party] to come get "20," likely 20

23  pounds of marijuana, and "Reggie" [BELL] "25," meaning 25 pounds of marijuana.  ORTEGA Sr.

24  told Matt ORTEGA that he needed that "shit," likely the marijuana harvested by ORTEGA Sr., gone

25  today.  I believe Matt ORTEGA sold 30 pounds of marijuana and had an additional 45 pounds left to

26  sell likely to BELL and an unknown third party nicknamed "B."

27

28

Affidavit of Rebecca Caceres                    19

48.     Previous to the above intercepted call, surveillance had observed a blue 2007 Mercedes CLS550 sedan park at 4100 Bixler Rd., Byron, CA, which is the residence of ORTEGA Sr., Marla ORTEGA, and Matt ORTEGA.  Around the same time the above intercepted call occurred, surveillance observed the blue 2007 Mercedes leave the area of 4100 Bixler Rd. occupied by one male driver, later identified as Siddiq Tariq JIHAD.  Surveillance maintained a constant visual of the Mercedes until a marked CHP officer conducted a traffic stop of the Mercedes.  During the CHP's investigation, approximately 30 clear plastic bags containing a total of approximately 30 pounds of marijuana and $10,250 in US Currency was seized.

49.     Based on the intercepted call between ORTEGA Sr. and Matt ORTEGA and the surveillance, I believe that Matt ORTEGA sold 30 pounds of marijuana to JIHAD for $92,000.  I also believe that ten pounds of the 30 pounds of marijuana had been supplied by ORTEGA Sr. and the rest of the marijuana had been supplied by an unknown third party.

50.     Besides Matt ORTEGA's involvement in distributing marijuana for ORTEGA Sr., there are intercepted calls between ORTEGA Sr. and Marla ORTEGA and ORTEGA Sr. and Jake WESTERMAN that indicated Matt ORTEGA's involvement in cultivating marijuana jointly with Jake WESTERMAN.[6]  Also, there are intercepted calls that detail Matt ORTEGA's assistance in the harvesting marijuana for ORTEGA Sr. and his partners McMILLIAN and THOMPSON.[7]

### 5.     Marcus WILLIAMS

51.     Based on observations by law enforcement officers and intercepted calls, I believe that WILLIAMS is involved in assisting ORTEGA Jr., ORTEGA Sr., GIARRUSSO, and other DTO members in the distribution of multiple pounds of marijuana.  WILLIAMS has the following criminal convictions: a) in 2003, felony conviction for possession of concentrated cannabis; b) in 2003, felony conviction for transportation of controlled substance; c) in 2005, felony conviction for possess marijuana for sale; d) in 2007, misdemeanor conviction for driving while license suspended.

52.     The following series of events that occurred on January 21, 2012, involved ORTEGA

---

[6] Refer to paragraphs 41-42, 131 and 147 that describe Matt ORTEGA and Jake WESTERMAN's involvement in cultivating marijuana.
[7] Refer to paragraphs 249-256, referencing the harvesting of marijuana at 849 Emily St., Mountain House, CA.

Jr. and WILLIAMS brokering the sale of 11 pounds of marijuana where ORTEGA Sr. was the source of supply and the 11 pounds was later seized by law enforcement from the purchasers:

53.    On January 21, 2012, ORTEGA Jr. received an incoming call from (510) 967-5543 (WILLIAMS). In this call, WILLIAMS told ORTEGA Jr. that he was going to need "11," meaning 11 pounds of marijuana. ORTEGA Jr. stated, "These ones are someone else's; I can't front them," I believe this means that ORTEGA Jr. could not provide them to WILLIAMS without payment first, but that in other instances ORTEGA Jr. and WILLIAMS would work together to traffic marijuana and split the proceeds. WILLIAMS said, "We got the bread," believed to mean money, and wanted to do it now.

54.    In subsequent calls between ORTEGA Jr. and ORTEGA Sr., I believe that ORTEGA Jr. contacted ORTEGA Sr. to provide ORTEGA Sr. with the opportunity to sell ORTEGA Sr.'s marijuana.

55.    On that same date after the above mentioned call, surveillance saw ORTEGA Sr. drive to "Trendsetterz" remove a large bag from the bed of his pickup and take the item into the shop. A short time later, surveillance observed ORTEGA Jr. and a black male, later identified as Marcus WILLIAMS, park their separate vehicles in front of "Trendsetterz" and walk inside the shop. Approximately five minutes later, surveillance agents saw two males, later identified as Indeep BASRA and Amanuel HAPTE, park a silver sedan in front of "Trendsetterz," and enter the shop. A short time later, WILLIAMS and BASRA and HAPTE walked out of the shop to their vehicles. Surveillance observed BASRA carry a large black plastic bag in his right hand and walk to the rear of the silver sedan. BASRA remained at the rear of the vehicle for a short time, likely to deposit the bag in the trunk of the care, before he entered the driver's seat and drove away from the shop. Agents maintained surveillance on the silver vehicle believed to contain the black bag until the California Highway Patrol (CHP) stopped the vehicle several minutes later. After consent to search was granted by BASRA, the driver and registered owner of the vehicle, the CHP officer located approximately 11 pounds of marijuana inside a black bag in the trunk.

56.    Subsequent intercepted calls between ORTEGA Sr. and Marla ORTEGA revealed

1 │ that ORTEGA Sr. had stated that it was his marijuana that had been seized by law enforcement. I

2 │ believe that ORTEGA Jr., with the assistance of WILLIAMS, brokered an 11 pound marijuana sale

3 │ between ORTEGA Sr., the source of supply, and BASRA and HAPTE, the buyers.

4 │      57.    On April 29, 2012, there were intercepted calls between ORTEGA Jr. and

5 │ WILLIAMS and ORTEGA Jr. and GIARRUSSO concerning the distribution of ten pounds of

6 │ marijuana. I believe that ORTEGA Jr. worked with WILLIAMS and GIARRUSSO to broker a sale

7 │ of ten pounds of marijuana between GIARRUSSO and WILLIAMS.[8]

8 │      58.    Based on the intercepted calls and surveillance, I believe that WILLIAMS is a

9 │ multiple pound broker of marijuana for the GROWERS CHOICE DTO.

### 6.    Anthony GIARRUSSO (AKA "Grom")

11 │      59.    As previously illustrated through court-authorized wire interceptions on TT#3,

12 │ Anthony GIARRUSSO has been identified as being involved in the cultivation and distribution of

13 │ marijuana for the DTO.[9] Surveillance by law enforcement showed that GIARRUSSO resides at

14 │ 3794 Frank Hengel, Oakley, CA. GIARRUSSO does not have any known criminal convictions.

15 │      60.    The following intercepted call details GIARRUSSO's role as a manager in the

16 │ operation of an indoor marijuana grow:

17 │      61.    On January 27, 2012, GIARRUSSO received an incoming call from (209) 303-4566

18 │ (used by Todd HENDERSON). During this call, GIARRUSSO asked HENDERSON what he

19 │ needed in addition to the "AMB" believed to possibly be equipment used to grow marijuana.

20 │ HENDERSON stated that he needed a "KB pouch" and two large and two small tanks believed to be

21 │ possibly equipment used to grow marijuana. GIARRUSSO told HENDERSON that he was on his

22 │ way. HENDERSON stated that he had to go to Oakdale, CA and would have "Rigo" [Rodrigo

23 │ GALVAN] meet with GIARRUSSO. I believe HENDERSON updated GIARRUSSO on equipment

24 │ that needed to be purchased to continue to supply an indoor growing operation that HENDERSON

25 │ maintained. I believe that GALVAN is HENDERSON's partner in the day-to-day management of

26 │

27 │ 8 Refer to paragraph 69 regarding the ten pound marijuana transaction.

    9 DEA is aware that GIARRUSSO was the user of TT#3 based surveillance, and subsequent wire intercepts

28 │ wheremonitors recognized his voice and nicknames/names.

1   the grow; however, GIARRUSSO manages the operation.  It was later determined through

2   surveillance that this indoor grow was located at 1228 S. Berkeley Ave., Turlock, CA.

3       62.     Between January 31, 2012 and February 1, 2012, there are intercepted calls detailing

4   the possibility that the marijuana grow located at 1228 S. Berkely Ave. might be robbed.[10]  After the

5   initial calls detailing the tip about a possible upcoming robbery, the following intercepted calls

6   details the preparations for protecting the marijuana grow:

7       63.     On January 31, 2012, GIARRUSSO made an outgoing call to (925) 759-5097 (used

8   by SCHMIDT).  GIARRUSSO told SCHMIDT that someone told "Rigo" [Rodrigo GALVAN] that

9   some "fools" had been following GALVAN and they knew about his "spot." GIARRUSSO

10  continued to say that "it is done in a fucking week and they are going to rob it tonight or tomorrow."

11  I believe GIARRUSSO told SCHMIDT that GALVAN was tipped off that someone had been

12  following GALVAN, and they knew about his indoor marijuana growing operation,.  I believe

13  GIARRUSSO and others believe that the people who followed GALVAN were going to steal the

14  marijuana before it was harvested.  GIARRUSSO stated that he needed "fools to go out there and

15  sleep with a strap," meaning firearm.

16      64.     On that same date, GIARRUSSO made an outgoing call to (925) 759-5097 (used by

17  SCHMIDT).  GIARRUSSO asked SCHMIDT if he could run an "XD" [Springfield XD pistol],

18  "Glock, and the Smith and Wesson 9mm and a couple boxes of bullets to the shop" ["Trendsetterz"]

19  for GIARRUSSO.  I believe that GIARRUSSO instructed SCHMIDT to provide three handguns and

20  ammunition to GIARRUSSO, which GIARRUSSO had intended on using to protect the indoor

21  growing operation that had been threatened to be robbed.

22      65.     Additionally, on that same date, GIARRUSSO made an outgoing call to (530) 209-

23  9355 (used by David LNU).  GIARRUSSO asked David LNU if he would stay at GIARRUSSO's

24  "spot" for a week if GIARRUSSO paid David LNU $1,000.  David LNU told GIARRUSSO that he

25  would talk to GIARRUSSO in person because he did not want to talk about it on the phone.

26  GIARRUSSO told David LNU to meet him at the "shop" ["Trendsetterz"].  I believe that

27

28  10 Reference is made to paragraphs 37-40.

Affidavit of Rebecca Caceres                    23

1  GIARRUSSO hired David LNU to help GIARRUSSO protect his indoor growing operation from
2  being robbed.

3      66.    Based on multiple intercepted calls and surveillance it was determined GIARRUSSO
4  jointly cultivating marijuana at 1228 S. Berkeley Ave. with ORTEGA Jr., GALVAN, and
5  HENDERSON and assisted in the protection of the grow location.[11]

6      67.    Based on electrical usage,[12] it is believed that the indoor marijuana grow that
7  GIARRUSSO spoke of had been located at 1228 S. Berkeley Ave. However, due to the above
8  mentioned incident, the electrical usage at that location appears to have dropped significantly leading
9  me to believe that once the marijuana was harvested in that location, the members of the DTO
10 discontinued growing there.

11     68.    On February 6, 2012, there were intercepted calls indicating that GIARRUSSO had
12 requested several people come over to his house for "work," believed to refer to trimming marijuana.
13 GIARRUSSO made an outgoing call to (925) 216-8052 (used by Matt ORTEGA).  GIARRUSSO
14 said, "Get over here."  Matt ORTEGA replied, "Who's over there?"  GIARRUSSO said, "Me, Kyle,
15 Eric, and Kyle."  Matt ORTEGA said, "I'll be over there in a little bit."  On that day, surveillance
16 observed multiple vehicles, believed to be those assisting in trimming, arriving and/or already
17 parked at GIARRUSSO and SCHMIDT's residence located at 3794 Frank Hengel Way and staying
18 for lengthy amounts of time. Matt ORTEGA's BMW was observed arriving later in the day.  I
19 believe that SCHMIDT and GIARRUSSO cultivate marijuana together in their residence.

20     69.  On more recent calls, I believe GIARRUSSO supplied possibly ten pounds of marijuana
21 to ORTEGA Jr., who brokered it to WILLIAMS.  On April 24, 2012, at approximately 12:07 p.m.,
22 ORTEGA Jr. received a call from GIARRUSSO.  GIARRUSSO said, "All this stuff from the first
23 day is all good, but we're getting into the second day shit and shit is hella wet," believed to refer to
24 marijuana which is not dried yet.  ORTEGA Jr. said, "Just see how many."  GIARRUSSO said he
25 would "get it bagged" and would call.  Approximately one hour later, ORTEGA Jr. called

26

27 11 Reference is made to paragraphs 37-42 regarding intercepted calls with ORTEGA Jr. involving a marijuana
   cultivation site at 1228 S Berkeley, Turlock, CA.
28 12 Reference paragraphs 41-42 for electrical usage details.

1  GIARRUSSO. ORTEGA Jr. asked, "What's the deal?" GIARRUSSO replied, "ten," believed to

2  refer to ten pounds of marijuana. ORTEGA Jr. asked how long until GIARRUSSO would be ready.

3  GIARRUSSO said he was on his way. Three minutes later, ORTEGA Jr. called WILLIAMS and

4  told him, "Head out here." WILLIAMS said that he needed someone to come with him." ORTEGA

5  Jr. said "Hurry." I believe WILLIAMS is the intended sub-distributor for the marijuana being

6  packaged by GIARRUSSO. That same day, at approximately 5:23 p.m., surveillance observed

7  WILLIAMS and a female in another vehicle, arrive at the **Trendsetterz** shop in tandem. Prior to

8  WILLIAMS arrival, GIARRUSSO was identified as being present at **Trendsetterz**. I believe that

9  ORTEGA Jr. brokered the sale of ten pounds of marijuana between GIARRUSSO and WILLIAMS.

10      70.    Also, there are intercepted calls that indicated that GIARRUSSO is partnered with

11  ORTEGA Jr., ADGATE, and SCHMIDT, in the cultivation of marijuana at a warehouse located in

12  Pittsburg, CA.[13]

13                          **7.   Jay DUPEE**

14      71.    Based on observations by law enforcement officers and intercepted calls, I believe

15  that DUPEE is involved in cultivating and distributing multiple pounds of marijuana in conjuction

16  with the GROWERS CHOICE DTO.I believe that DUPEE uses the same source for cloned

17  marijuana plants as other members of the ORTEGA DTO to supply his indoor marijuana grows.

18  Surveillance by law enforcement showed that DUPEE resides at 450 Coletas Way, Byron, CA

19  located in the Northern District of California. DUPEE has the following criminal convictions: a) in

20  1984, misdemeanor conviction for theft.

21      72.    On January 25, 2012, GIARRUSSO made an outgoing call to (925) 759-1390 (used

22  by DUPEE). During this call, GIARRUSSO told DUPEE to get "30," meaning 30 pounds of

23  marijuana ready. DUPEE asked GIARRUSSO if it was a "scam." GIARRUSSO told DUPEE that

24  he told "Brock" [Brock ENRICO], who was handling the whole thing, that if there was any

25  "bullshit" to just grab the marijuana and leave. GIARRUSSO asked DUPEE how "they"

26  [marijuana] looked. DUPEE responded that "they" were beautiful, cured pretty well, and nothing

27

28  13 Reference is made to paragraphs 94-97 regarding intercepted calls between ADGATE and ORTEGA Jr., which
    implicates GIARRUSSO's involvement in the cultivation of marijuana at a warehouse in Pittsburg, CA.

1  could be complained about.  DUPEE said that GIARRUSSO was making "$1,500" for talking on the
2  phone.

3      73.    I believe GIARRUSSO was brokering the sale of 30 pounds of marijuana between
4  DUPEE, the source, and a third party.  I believe that GIARRUSSO likely made $1,500 for his role as
5  a "broker."  I believe that, because of the large quantity of marijuana involved, DUPEE was afraid
6  that there may be a possibility that they may be walking into a trap where they may get robbed.  I
7  believe that GIARRUSSO instructed ENRICO, the courier, to immediately leave the meeting if it
8  appeared something was wrong.

9      74.    Based on intercepted calls between GIARRUSSO, and BECERRA, and
10  GIARRUSSO and ENRICO,[14] I believe that GIARUSSO, BECERRA, ENRICO, and DUPEE
11  conspired to distribute 30 pounds of marijuana.

12      75.    The following intercepted call details that both DUPEE and ORTEGA Sr. ordered
13  cloned sapling marijuana plants from KUESTER, which were picked up at the Growers Choice in
14  Hayward, CA:

15      76.    On January 17, 2012, at approximately 9:42 a.m., ORTEGA Sr. received an incoming
16  call from (925) 759-1390 (used by Jay DUPEE). In this call, ORTEGA Sr. told DUPEE that he was
17  driving to "Hayward." DUPEE said, "I gotta go out there in a while myself." ORTEGA Sr. asked,
18  "For what?" DUPEE said, "To see Kevin," believed to refer to KUESTER. ORTEGA Sr. asked
19  what DUPEE was getting. DUPEE replied, "What do you think?" ORTEGA Sr. said, "That's what
20  I'm going for." ORTEGA Sr. asked how many DUPEE was getting. DUPEE replied, "three,"
21  believed to refer to 300 marijuana clones. DUPEE asked ORTEGA Sr. how many ORTEGA Sr.
22  was getting. ORTEGA Sr. said, "420," believed to refer to 420 marijuana clones. Later, ORTEGA
23  Sr. complained about THOMPSON. DUPEE offered, "Do you want me to grab those for you when
24  I'm out there?" ORTEGA Sr. said, "I don't want you to take that many with you. You'll have like a
25  1,000 or something. That's too much. I don't like you, but I don't want to risk you," believed to refer
26  to the combined ORTEGA Sr. and DUPEE marijuana clone order being around 1,000 plants.

27

28  14 Reference is made to paragraphs 72-74.

Affidavit of Rebecca Caceres

77.     At approximately 11:02 a.m., surveillance observed THOMPSON arrive at the Grower's Choice store in Hayward, CA, driving his SUV pulling a trailer.  Several minutes later, ORTEGA Sr. was observed by surveillance arriving at the same store.  About ten minutes later, surveillance observed a white van being driven by a male, believed to be Jay DUPEE, arrive at the store.

78.     At approximately 11:22 a.m., surveillance observed KUESTER arrive in the previously observed white van from his house, at the Grower's Choice store in Hayward, CA and park near THOMPSON's SUV.  Surveillance observed KUESTER unload approximately seven boxes from his white van.  THOMPSON was observed loading three of them into his SUV.  DUPEE was observed loading four boxes into his van.  I believe those boxes contained the marijuana plants ordered from KUESTER.

79.     I checked the telephone tolls for the telephone DUPEE was intercepted and noticed he is in recent contact with the following members of the GROWERS CHOICE DTO between March 1, 2012 through April 22, 2012:  ORTEGA Jr. (130 contacts), BELL (53 contacts), ORTEGA Sr. (46 contacts), Matt ORTEGA (39 contacts), BECERRA (6 contacts), Anthony WINTERS (5 contacts), LAURENS (4 contacts), and Marla ORTEGA (2 contacts).

### 8.    **Brock ENRICO**

80.     Based on observations by law enforcement officers and intercepted calls, I believe that ENRICO is involved in the cultivation and distribution of multiple pounds of marijuana.  I believe that ENRICO cultivates his marijuana within his residence and assists other members of the Grower's Choice DTO, including GIARRUSSO in the cultivation of marijuana.  Surveillance by law enforcement showed that ENRICO resides at 801 O'hara Ct., Oakley, CA located in the Northern District of California.  ENRICO does not have any criminal history convictions.

81.     The following intercepted call details GIARRUSSO instructing ENRICO to pickup 30 pounds of marijuana from DUPEE and deliver it to BECERRA's residence where a "buyer" would provide the money for the sale: [15]

---

15 Reference is made to an intercepted call between GIARRUSSO and DUPEE in paragraphs 72-74.

82.     On January 25, 2012, GIARRUSSO received an incoming call from (925) 575-4428 (used by ENRICO). During this call, GIARRUSSO asked ENRICO if he was at "Jay's" [DUPEE]. ENRICO told GIARRUSSO that he was at DUPEE's house and asked what the deal was. GIARRUSSO explained that "Todd" [Todd BECERRA] was at his house and a third party was there or on the way. GIARRUSSO instructed ENRICO to count every single dollar. ENRICO told GIARRUSSO that it would take him forever. GIARRUSSO asked ENRICO who was going with him. ENRICO stated no one except the "Glock .40 sub-compactor in the back pocket." GIARRUSSO stated that "they," likely BECERRA, called to add the extra "ten," meaning ten pounds, so "they" [the buyers] were for sure.

83.     I believe that GIARRUSSO had instructed ENRICO to deliver the 30 pounds of marijuana to BECERRA's residence where a third party would provide the cash to pay for the marijuana. I believe ENRICO brought a Glock .40 caliber pistol with him to protect himself and the marijuana from being robbed. I believe that ENRICO conspired with DUPEE, GIARRUSSO, and BECERRA to distribute 30 pounds of marijuana.
The following call details ENRICO's involvement with the cultivation of marijuana: On January 30, 2012, GIARRUSSO received an incoming call from (925) 575-4428 (used by Brock ENRICO). GIARRUSSO asked ENRICO to "Take a picture of those things," believed to be marijuana. ENRICO asked why. GIARRUSSO replied "I think my buddy is going to buy them tomorrow." ENRICO said they didn't look good because he wasn't taking care of them. I believe GIARRUSSO intended to broker a marijuana deal using a photograph to show the potential buyer the quality of the marijuana.

84.     I believe that ENRICO and GIARRUSSO are partnered in the cultivation of marijuana at ENRICO's residence.

### 9.     Todd BECERRA (AKA: Todd ZEMBIK)

85.     Based on observations by law enforcement officers and intercepted calls, I believe that BECERRA is involved in cultivating and distributing marijuana and BECERRA brokers multiple pounds marijuana transactions for multiple sources of supply including ORTEGA Jr., Jay

1  DUPEE, ORTEGA Sr., and other members within the organization. I also believe that BECERRA is
2  involved in cultivating marijuana for distribution. The address listed with DMV for BECERRA is
3  **2835 "Reves" Ln, Tracy, CA** ["Reves" is likely a typo for "Reyes"] as of September 3, 2011.
4  Surveillance by law enforcement showed that BECERRA resides at **2835 Reyes Ln, Tracy, CA**
5  located in the Eastern District of California. BECERRA has the following criminal convictions:  a)
6  in 2007, misdemeanor conviction for Battery of Spouse, Ex-Spouse or Date.

7      86.     The following intercepted call details BECERRA brokering multiple pounds of
8  marijuana between GIARRUSSO, BECERRA's source of supply, and a buyer:  On January 25,
9  2012, GIARRUSSO made an outgoing call to (209) 321-3468 (used by BECERRA). During this
10  call, BECERRA told GIARRUSSO to tell his "boy" to meet him at "Trendsetterz" at 7:45 p.m.
11  GIARRUSSO responded that they were not going to do anything like that at the shop anymore and
12  they should meet at another location. GIARRUSSO told BECERRA that he was paying "29,"
13  meaning $2,900 per pound, and would charge BECERRA "three," meaning $3,000 per pound
14  because GIARRUSSO needed to split his profit with "Brock" [ENRICO]. GIARRUSSO asked
15  BECERRA if he had sold any of the "21," meaning 21 pounds of marijuana. BECERRA told
16  GIARRUSSO that he had sold "two" [pounds] of GIARRUSSO's for "28," meaning $2,800 per
17  pound, because "one of them had a lot of shake and it was short." Shake refers to the loose leaves,
18  seeds and stems, which is believed to contain the lesser part of processed marijuana. GIARRUSSO
19  explained to BECERRA that he had told "Jay" [DUPEE] that he needed "20," meaning 20 pounds of
20  marijuana, today and "20" [pounds] tomorrow.

21      87.     I believe that GIARRUSSO was brokering a 40 pound marijuana transaction between
22  DUPEE, the supplier, and BECERRA the broker for an unknown third party. I believe that
23  GIARRUSSO was to pay DUPEE $2,900 per pound and would charge BECERRA $3,000 per pound
24  in order to make a profit that he would have to share with ENRICO, the courier.

25      88.     In the following recorded call, GIARRUSSO spoke with ORTEGA Sr. concerning
26  BECERRA assisting GIARRUSSO in the sale of GIARRUSSO's marijuana.

27      89.     On January 15, 2012, GIARRUSSO made an outgoing call to ORTEGA Sr. During

28

Affidavit of Rebecca Caceres                          29

1  this call, GIARRUSSO told ORTEGA Sr. that a third party needed "ten," meaning ten pounds of

2  marijuana on "Tuesday." Based on previous calls, I believed that ORTEGA Sr. mentioned

3  BECERRA as the third party. ORTEGA Sr. asked GIARRUSSO if he left his "shit," meaning

4  marijuana, with a third party. GIARRUSSO responded that he did, but GIARRUSSO was desperate

5  right now. ORTEGA Sr. asked if GIARRUSSO knew where the third party [BECERRA] lived.

6  GIARRUSSO said that the third party [BECERRA] and "Derek" [WINTERS] had a "house" in

7  Tracy, CA. ORTEGA Sr. said that he might have known because "Marla" [ORTEGA] may have

8  told him.

9       90.     I believe that GIARRUSSO told ORTEGA Jr. that BECERRA wanted to broker the

10  sale of ten pounds of marijuana for the GROWERS CHOICE DTO. I believe that ORTEGA Sr. and

11  GIARRUSSO discussed how GIARRUSSO leaves his marijuana to be sold by BECERRA for

12  GIARRUSSO. I believe that ORTEGA Sr. and GIARRUSSO discussed that GIARRUSSO trusted

13  BECERRA because BECERRA and Derek WINTERS had partnered in the cultivation of marijuana

14  at an unknown location in Tracy, CA.

15      91.     The following intercepted call details BECERRA and Derek WINTER's involvement

16  in the cultivation and distribution of marijuana:

17      92.     On January 18, 2012, ORTEGA Jr. received an incoming call from (209) 450-6246

18  (used by Derek WINTERS). During this call, ORTEGA Jr. told Derek WINTERS that they should

19  give "Todd" [BECERRA] the "five grand," meaning $5,000, because it was "Todd's" [BECERRA]

20  problem and not to put it up on Derek WINTERS "shit." ORTEGA Jr. told Derek WINTERS to tell

21  "Todd" [BECERRA] that it was not going to come out of Derek WINTERS' "shit." I believe

22  ORTEGA Jr. gave Derek WINTERS advice about having BECERRA take care of a debt from the

23  theft of marijuana. I believe ORTEGA Jr. wanted Derek WINTERS to make sure BECERRA paid

24  for it rather than take anything from Derek WINTERS.

25      93.     Based on the above referenced intercepted calls, I believe that BECERRA assists the

26  GROWERS CHOICE DTO to include GIARRUSSO in the distribution of marijuana. Also, I

27  believe that BECERRA and Derek WINTERS are partnered in an indoor growing operation

28

Affidavit of Rebecca Caceres                                30

1  somewhere in Tracy, CA.

2  ### 10. **Steven ADGATE**

3  94.   Based on observations by law enforcement officers and intercepted calls, I believe
4  that ADGATE is involved in the cultivation and distribution of multiple pounds of marijuana and is
5  partnered in the cultivation with ORTEGA Jr., GIARRUSSO, and SCHMIDT.  The address listed on
6  ADGATE's driver's license listed **20175 Sherman Island E LE Road, Rio Vista, CA**, since June
7  1, 2011.  Surveillance by DEA showed that ADGATE resides at **20175 Sherman Island E LE**
8  **Road** located in the Eastern District of California.  Also, ADGATE owns rural property that
9  contains outbuildings across the street at **20154 Sherman Island E LE Road.**  ADGATE has the
10 following criminal conviction:  a) in 2008, misdemeanor conviction for aid or abet in exhibition of
11 speed.

12 95.   The following surveillance and intercepted calls detail ADGATE's involvement with
13 ORTEGA Jr., GIARRUSSO, and SCHMIDT in establishing an indoor marijuana growing operation
14 in a warehouse located in Pittsburg, CA[16]:

15 96.   On April 5, 2012, surveillance followed SWIERS and ORTEGA Jr. to Lowes where
16 they were observed purchasing building materials.  At approximately 10:22 a.m., they were followed
17 to a gate in front of 605 Industry Rd., Antioch, CA where ORTEGA Jr. got out and unlocked the
18 gate, waited for SWIERS to drive through, and locked the gate behind them.  The vehicle was then
19 observed entering the warehouse building via a roll up door, which was closed behind it.  A short
20 time later, GIARRUSSO's truck was observed parked in front of the same roll up door at 605
21 Industry Rd. (although GIARRUSSO was not observed).

22 97.   On April 10, 2012, ORTEGA Jr. received two incoming calls from (707) 372-5488
23 (used by ADGATE).  During these calls, ADGATE told ORTEGA Jr. that ADGATE needed to get a
24 cashier's check today for rent and ADGATE would have "Kyle" [SCHMIDT] go do it.  ORTEGA
25 Jr. asked if they were supposed to give "SCHMIDT "$1,800 bucks or something."  ADGATE
26 agreed.  ORTEGA Jr. stated that SCHMIDT should go and get the money order.  ORTEGA Jr. told

27

28 16 Refer to paragraphs 105-107 for additional intercepted calls involving SWIERS involvement in conducting the
electrical work to setup the indoor marijuana growing lights.

1   ADGATE that that was ADGATE and SCHMIDT building and maintenance was their department.

2   ADGATE told ORTEGA Jr. that that was fine, but he still needed money from ORTEGA Jr. and

3   from "Grom" [GIARRUSSO].

4       98.    I believe that ORTEGA Jr. stated that the indoor growing operation located in the

5   warehouse located at 605 Industry Rd. was managed by ORTEGA Jr., ADGATE, GIARRUSSO,

6   and SCHMIDT. I believe that SCHMIDT put his name on the rental agreement for the warehouse. I

7   believe that the agreement was that the monthly rent was divided between all four at $1,800 per

8   month.

9       99.    Besides assisting working with ORTEGA Jr., GIARRUSSO, and Kyle SCHMIDT in

10   the setup of an indoor growing operation at 605 Industry Rd., Antioch, CA, additional intercepted

11   calls show that ADGATE is managing his own indoor marijuana growing operations. The following

12   call details that ADGATE is involved in the distribution marijuana from additional established

13   marijuana cultivation operations:

14       100.    On January 31, 2012, ORTEGA Jr. received an incoming call from telephone number

15   (707) 372-5488 (used by ADGATE). In this call, ADGATE said he was on his way to "L.A." to

16   drop "four," meaning four pounds of marijuana. ORTEGA Jr. asked if ADGATE was getting paid

17   for "them." ADGATE said "yeah." I believe ADGATE and ORTEGA Jr. discussed ADGATE's

18   trip to Los Angeles to sell four pounds of marijuana.

19       101.    On February 27, 2012, the Antioch Police Department served a search warrant at a

20   warehouse in Antioch, California and seized several hundred marijuana plants and approximately 30

21   pounds of processed marijuana from a warehouse-grow linked to ADGATE (lease co-signer). At

22   that time, ADGATE used the same telephone he has been intercepted on in this investigation to

23   contact the Antioch Police Department to cooperate. According to an Antioch Police Department

24   detective, ADGATE admitted the marijuana-warehouse operation was something he was involved in

25   and profited from since 2010. In April 2012, ADGATE submitted a new statement, through his

26   attorney, minimizing his role and claiming that he believed the marijuana-grow in Antioch was

27   being setup as a legal, medical-marijuana site.

28

1

## 11.   **Bryan SWIERS**

2   102.   Based on observations by law enforcement officers and intercepted calls, I believe

3   that SWIERS is involved in the cultivation of multiple pounds of marijuana and that SWIERS

4   facilitates the cultivation for the Grower's Choice DTO by setting up and taking down the electrical

5   system for indoor marijuana cultivation sites.  Surveillance by law enforcement showed that

6   SWIERS resides at 5443 Gold Creek Cir., Byron, CA.  SWIERS has no known criminal history.

7   103.   The following intercepted calls detail SWIERS involvement with ORTEGA Jr. and

8   ADGATE and the construction of a warehouse sized indoor marijuana grow located in Pittsburg,

9   CA:

10   104.   On April 11, 2012, ORTEGA Jr. made an outgoing call to (707) 372-5488 (used by

11   ADGATE).  During this call, ORTEGA Jr. told ADGATE that he needed ADGATE to meet "Brian"

12   [SWIERS] at the shop/office right now because ORTEGA Jr. was getting "A/Cs."  ADGATE asked

13   ORTEGA Jr. who he was meeting.  ORTEGA Jr. stated "Brian, the electrician" [SWIERS] and

14   SWIERS was on his way there.  ORTEGA Jr. told ADGATE that he wanted SWIERS to finish up at

15   least one room.

16   105.   I believe that SWIERS was hired by ORTEGA Jr. to conduct electrical work at the

17   warehouse to get it setup for the growing lights to grow marijuana.  I believe that ORTEGA Jr.

18   directed ADGATE to assist SWIERS by letting SWIERS into the warehouse and tasking him with

19   getting at least one room ready to harvest marijuana.

20   106.   A few minutes later, ORTEGA Jr. received an incoming call from (925) 337-0127

21   (used by SWIERS).  During this call, ORTEGA Jr. told SWIERS that "ADGATE" was going to

22   meet him there.  ORTEGA Jr. explained that ORTEGA Jr. did not need the lights on today because

23   he would not have "kids," meaning sapling marijuana plants, there until the weekend.  ORTEGA Jr.

24   told SWIERS that he needed the plug boxes in the room wired so they could put all the trays in the

25   way and did not want to block SWIERS.

26   107.   I believe that ORTEGA Jr. instructed SWIERS to wire boxes that they would use to

27   plug in equipment used in the growing of marijuana.  I believe that ORTEGA Jr. told SWIERS that

28

Affidavit of Rebecca Caceres                    33

SWIERS did not need to turn any growing lights on because ORTEGA Jr. would not be able to have any sapling marijuana plants to grow until the weekend.

108.    Besides assisting working with ORTEGA Jr. in the setup of an indoor growing operation at 605 Industry Rd., Antioch, CA, additional intercepted calls show that SWIERS is managing his own indoor marijuana growing operation at his residence.  The following call details SWIERS marijuana cultivation:

109.    On April 18, 2012, ORTEGA Jr. received an incoming call from (925) 337-0127 (used by SWIERS).  During this call, SWIERS told ORTEGA Jr. that SWIERS needed someone to take his "shit to dry."  SWIERS explained that he needed to get it out of his house tonight because he had been trimming and he thought his neighbor called the cops because the Sheriff showed up. ORTEGA Jr. told SWIERS he would call him back.

110.    I believe SWIERS needed a place to hide his freshly harvested marijuana ("to dry") so that the Sheriff Deputy would not smell or discover the marijuana-grow inside his residence.  I believe "trimming" refers to SWIERS harvesting the marijuana.  On April 19, 2012, SA Chase Cook spoke to Contra Costa SO Detective Brian Gardener who found out that a deputy responded to an unrelated 911 call approximately four houses away from 5443 Gold Creek Cir, Discovery Bay, CA the same day and approximately around the same time as the of the above referenced call.

### 12.    Kyle SCHMIDT

111.    Based on observations by law enforcement officers and intercepted calls, I believe that SCHMIDT is involved in the cultivation of multiple pounds of marijuana.  I believe that SCHMIDT is partnered with GIARRUSSO in the cultivation of marijuana.  Also, I believe that SCHMIDT assists other members of the DTO, including ORTEGA Sr., in the harvesting of marijuana.  Surveillance by law enforcement showed that SCHMIDT resides at 3794 Frank Hengel, Oakley, CA.  SCHMIDT does not have any known criminal convictions.

112.    Besides assisting working with ORTEGA Jr., GIARRUSSO, and ADGATE in the setup of an indoor growing operation at 605 Industry Rd., Antioch, CA, [17] additional intercepted

---

17 Refer to the intercepted calls between ADGATE and ORTEGA Jr. located in paragraphs 94-97.

calls show that SCHMIDT is managing his own indoor marijuana growing operation at his residence. The following calls detail SCHMIDT's cultivation of marijuana:

113. On January 15, 2012, GIARRUSSO received an incoming call from (925) 759-5097 (used by SCHMIDT). During this call, SCHMIDT asked GIARRUSSO if the "PH" was "6.4." GIARRUSSO instructed SCHMIDT to "put like half a cap." SCHMIDT asked if that would bring it all the way down. GIARRUSSO told SCHMIDT that it would bring it down, and that GIARRUSSO has noticed that he has had to use a lot of it. I believe that SCHMIDT asked for advice from GIARRUSSO on how to maintain the chemical balance in the cultivation of marijuana.

114. On January 16, 2012, GIARRUSSO made an outgoing call to (925) 759-5097 (used by SCHMIDT). During this call, SCHMIDT asked GIARRUSSO if he would help SCHMIDT on his "room," likely a room in his residence used to grow indoor marijuana. SCHMIDT said that it was "week three" and asked if they should start "bambooing." I believe SCHMIDT told GIARRUSSO that SCHMIDT's indoor marijuana growing operation was in the third week of the growing cycle. SCHMIDT told GIARRUSSO that he had things to do all week and needed GIARRUSSO's help. GIARRUSSO asked SCHMIDT where SCHMIDT was at. SCHMIDT responded that he was at "Wayne's" [uknown third party] and just got finished doing Wayne's "shit." I believe that SCHMIDT wanted to finish the maintenance on SCHMIDT's indoor marijuana grow with GIARRUSSO's assistance. I believe that SCHMIDT recently finished helping an unknown third party with his indoor grow.

### 13. Dusty BURGE

115. Based on observations by law enforcement officers and intercepted calls, I believe that BURGE is involved in the cultivation and distribution of multiple pounds of marijuana as directed by ORTEGA Sr. Surveillance by law enforcement showed that BURGE resides at 14720 Byron Hwy, Unit 3, Byron, CA located in the Northern District of California. BURGE does not have any known criminal convictions.

116. On April 17, 2012, ORTEGA Sr. received an incoming call from (925) 584-4315 (used by Burge). During this call, ORTEGA Sr. told BURGE that ORTEGA Sr. wondered why

"Bryan" [SWIERS] had told "Jay" [DUPEE] that they had BURGE's house "blowing up," meaning using large amounts of electricity for growing indoor marijuana. BURGE told ORTEGA Sr. that it was about "90%" done and they probably had two more hours. ORTEGA Sr. told BURGE that he would get on them [unknown third party] because ORTEGA Sr. thought they were just waiting on "plants," likely marijuana plants.

117.    I believe that ORTEGA Sr. was upset at SWIERS for telling Jay DUPEE that ORTEGA Sr. and BURGE had used a location in BURGE's control to grow indoor marijuana. Also, I believe BURGE told ORTEGA Sr. that work being done on his residence in preparation for growing indoor marijuana was almost completed. I believe ORTEGA Sr. was going to encourage an unknown third party to complete the work as soon as possible so that they could plant sapling marijuana plants.

118.    In an intercepted call between THOMPSON and ORTEGA Sr., ORTEGA Sr. told THOMPSON that ORTEGA Sr. and "Dusty" [BURGE] had taken "25" for a third party. I believe that ORTEGA Sr. told THOMPSON that ORTEGA Sr. and BURGE sold 25 pounds of marijuana to an unknown third party.[18]

### 14.    Charles ERICKSON

119.    Based on observations by law enforcement officers and intercepted calls, I believe that ERICKSON is partnered with THOMPSON and ORTEGA Sr. in the cultivation of multiple pounds of marijuana. Surveillance has been unable to determine where ERICKSON resides, but it is possible based on intercepted calls that he resides at the warehouse at 2002 E. Home St., Fresno, CA. ERICKSON has the following criminal convictions: a) in 1995, misdemeanor conviction for obtain money by false pretenses; b) in 2000, misdemeanor conviction for threaten crime with intent to terrorize; c) in 2000, misdemeanor conviction for building false box in a vehicle for controlled substance; d) in 2001, felony conviction in Indiana for dealing in marijuana and possession of hashish; e) in 2009, misdemeanor conviction for exhibit deadly weapon, not a firearm; f) in 2010, misdemeanor convicted for DUI Alcohol/0.08 Percent.

---

18 For additional details, refer to the intercepted call between ORTEGA Sr. and THOMPSON located in paragraph 141.

120.     Intercepted calls revealed that an indoor marijuana growing operation exists at 2002 E. Home St., Fresno, CA. This operation is tended to by ERICKSON and OLIBAS with assistance from WESTERMAN and managed by THOMPSON and ORTEGA Sr. The following surveillance observations and intercepted calls detail the maintenance of the marijuana grow:

121.     On January 27, 2012, surveillance observed ORTEGA Sr. park his pickup in front of a warehouse located at **2002 E. Home St.** Surveillance observed ORTEGA Sr., WESTERMAN, and the third male adult approach the building out of view. A short time later, surveillance observed THOMPSON park his Cadillac Escalade in front of **2002 E. Home St.** and walk towards the front of the building and out of view.

122.     On January 27, 2012, ORTEGA Sr. made and received calls to and from (559) 999-0614 (used by ERICKSON). During these calls, ERICKSON told ORTEGA Sr. that he had an appointment with the landlord at "1:30" to take measurements and if it would be feasible right now. ORTEGA Sr. told ERICKSON they had "shit" everywhere right now. ORTEGA said that they would lock everything back in the trailer and they would leave. ORTEGA Sr. said that all their "scraps," likely meaning harvested marijuana, would be lying out. ERICKSON told ORTEGA Sr. that that was no "biggie," that the "general visualization" is what they wanted to avoid. I believe that ERICKSON told ORTEGA Sr. that the landlord for the warehouse was going to need to go inside the warehouse to take measurements for a construction project. I believe that ORTEGA Sr. told ERICKSON that ORTEGA Sr. and others had been in the process of harvesting the marijuana inside and did not want the landlord to know. I also believe that ERICKSON told ORTEGA Sr. that the landlord is aware of the marijuana growing inside the warehouse.

123.     After the above intercepted call, surveillance observed ORTEGA Sr. and four other males enter ORTEGA Sr.'s pickup truck and leave the area of the warehouse at **2002 E. Home St.** Between 1:22 p.m. and 1:38 p.m., surveillance observed three pickup trucks park at the warehouse, including the one in which ERICKSON had been the passenger. At approximately 2:54 p.m., surveillance saw the same three pickups leave the warehouse. At approximately 3:03 p.m., surveillance observed ORTEGA Sr. park his truck in front of the warehouse. Surveillance watched

1  all the occupants of ORTEGA Sr.'s pickup get out of the truck and walk toward the front of the
2  warehouse.

3      124.    I believe that ORTEGA Sr., WESTERMAN, THOMPSON, and two unidentified
4  people were harvesting marijuana at the warehouse located at **2002 E. Home St.** I believe that while
5  marijuana was being grown inside the warehouse, the landlord went into the warehouse to take
6  measurements of the inside for a future construction project. I believe that ERICKSON is on the
7  rental agreement for the warehousethat ERICKSON maintains for ORTEGA Sr.

8                          **15.   Travis OLIBAS**

9      125.    Based on observations by law enforcement officers and intercepted calls, I believe
10 that OLIBAS is involved in the cultivation of multiple pounds of marijuana as directed by ORTEGA
11 Sr. and ERICKSON. Surveillance by law enforcement has not been able to fully identify where
12 OLIBAS resides, but it is possible, based on intercepted calls, that both ERICKSON and OLIBAS
13 may live at the warehouse at 2002 E. Home St., Fresno, CA.. OLIBAS has the following criminal
14 convictions: a) in 2008, misdemeanor conviction reckless driving on a highway; b) in 2011,
15 misdemeanor conviction for possessing a hypodermic needle or syringe.

16     126.    The following intercepted call details OLIBAS' continued involvement in the
17 cultivation of marijuana for ORTEGA Sr. at 2002 E. Home St.: [19]

18     127.    On April 12, 2012, ORTEGA Sr. received an incoming call from (925) 784-5937
19 (used by OLIBAS). During this call, OLIBAS told ORTEGA Sr. that he was going to start week
20 "eight," meaning the eighth week in the marijuana growing cycle, on "Saturday night at 10 p.m."
21 [April 14, 2012]. ORTEGA Sr. questioned OLIBAS if the "ninth week" was on the 22nd [April 22,
22 2012]. OLIBAS affirmed. ORTEGA Sr. stated that they would start "work," likely meaning
23 preparation for harvesting of the marijuana, on the "25[th]" [April 25, 2012]. ORTEGA said if all went
24 well he would take "18 more lights," meaning lights used to grow marijuana, and they were going to
25 "fire up the other room" as long as "Charlie" [ERICKSON] worked out all right.

26     128.    I believe that OLIBAS is assisted in the cultivation of marijuana at the warehouse

27 ─────────────────────────────
28 19 Refer to the surveillance on January 27, 2012 and the intercepted calls between ORTEGA Sr. and ERICKSON
   described in paragraphs 235-241.

located at **2002 E. Home St.** I believe that ORTEGA planned to convert another room in the warehouse to expand his indoor marijuana growing operation by adding approximately 18 more growing lights. Based on my experience, it is possible to grow between eight and ten marijuana plants per light. If ORTEGA Sr. was to add an additional 18 lights, ORTEGA Sr. would need to plant an additional 144 to 180 more marijuana plants.

### 16.   <u>Jake WESTERMAN</u>

129.   Based on observations by law enforcement officers and intercepted calls, I believe that WESTERMAN is involved in the cultivation of multiple pounds of marijuana. I believe that WESTERMAN assists members of the DTO in the cultivation of marijuana, including ORTEGA Sr. Also, I believe that WESTERMAN and Matt ORTEGA are partnered in the cultivation of their own marijuana. Surveillance by law enforcement showed that WESTERMAN resides at 1565 Buena Vista, Livermore, CA. WESTERMAN does not have any known criminal convictions.

130.   The following intercepted call details ORTEGA Sr. asking WESTERMAN to assist him in harvesting marijuana at a warehouse located at 2002 E. Home St., Fresno, CA:

131.   On January 19, 2012, ORTEGA Sr. made and received incoming and outgoing calls to and from (925) 493-0327 (used by WESTERMAN). During these calls, ORTEGA Sr. asked WESTERMAN if he wanted to work on Saturday or Sunday in Fresno. WESTERMAN said he would go. ORTEGA Sr. asked WESTERMAN "Can you do 30 … 24 lights that fast?" It is typically the case that an average of eight to ten marijuana plants can be grown under one light at a time. I believe that ORTEGA Sr. asked WESTERMAN if he could harvest between 200 and 300 marijuana plants in a short period of time. WESTERMAN said that he did not know, but would try. ORTEGA Sr. said that "Travis" [OLIBAS] was over there too. I believe ORTEGA Sr. recruited WESTERMAN and OLIBAS to help cultivate marijuana in an indoor growing operation located in Fresno, CA.

132.   Besides assisting ORTEGA Sr. in the harvesting of marijuana at 2002 E. Home St., Fresno, CA,[20] additional intercepted calls show that WESTERMAN is managing his own indoor

---

[20] Additional reference to the surveillance on January 27, 2012 placing WESTERMAN at the warehouse located at 2002 E Home St., Fresno, CA. is in paragraph 236.

marijuana growing operation. Additionally, there are intercepted calls between ORTEGA Sr. and Marla that indicated WESTERMAN's involvement in cultivating marijuana jointly with Matt ORTEGA.[21] The following call details the tending of WESTERMAN's indoor marijuana:

133.   On April 9, 2012, ORTEGA Sr. made an outgoing call to (925) 961-2198 (used by Jake WESTERMAN). During this call, ORTEGA told WESTERMAN to "mix up the water, take the insert with the things in it out of the tray, leave the tray on the table, put about a half an inch of water at the bottom of the tray, and set the tray back in there." ORTEGA Sr. explained that it would "absorb all the water evenly now." ORTEGA Sr. asked how WESTERMAN was going to get into the shop. WESTERMAN stated that he was "leaving his house right now" and asked if ORTEGA Sr. could leave a key somewhere.

134.   I believe WESTERMAN received advice from ORTEGA Sr. on how to efficiently water WESTERMAN's marijuana plants. I believe that WESTERMAN uses the house he lives in to grow indoor marijuana.

### 17.   Justin McMILLIAN

135.   Based on observations by law enforcement officers and intercepted calls, I believe that McMILLIAN is involved in the cultivation of multiple pounds of marijuana as directed by ORTEGA Sr. Surveillance by law enforcement showed that McMILLIAN resides at 5125 Parks Ave., Salida, CA, located in the Eastern District of California. McMILLIAN has the following criminal convictions: a) 2004, misdemeanor conviction for driving while license is suspended.

136.   The following intercepted calls on January 17, 2012 and January 18, 2012 show that Justin McMILLIAN assists ORTEGA Sr. and a third party believed to be THOMPSON in the cultivation of marijuana:

137.   On January 17, 2012, ORTEGA Sr. made an outgoing call to (209) 495-7328 (used by McMILLIAN. During this call, ORTEGA Sr. told McMILLIAN that there were "eight," likely meaning eight sapling marijuana plants, that had fallen over, but it was because they needed water. ORTEGA Sr. stated that there was too much light on them and that it kills them when they are little

---

21 Paragraphs 40-42, 236–and 241 detail Matt ORTEGA and Jake WESTERMAN's involvement in cultivating marijuana.

1  and needed to let them get used to it. I believe that ORTEGA Sr. and McMILLIAN discussed the

2  health of recently planted sapling marijuana plants. McMILLIAN asked if that was the way they

3  had done it last time … every other light. ORTEGA Sr. stated that he did not think so and that it had

4  been hot in there. ORTEGA Sr. explained that he had fixed it all and made "him" [third party

5  believed to be THOMPSON] get in the attic and unplug and plug "lights," meaning lights used

6  specifically to grow indoor plants. McMILLIAN stated that he had told "him" [THOMPSON]

7  McMILLIAN's "back was on fire" from leaning over and planting. ORTEGA Sr. explained that

8  "he" [THOMPSON] had not bagged anything and went riding instead. I believe ORTEGA Sr. stated

9  that THOMPSON had not bagged the harvested marijuana as was instructed by ORTEGA Sr., and

10  THOMPSON decided to ride his motorcycle instead.

11      138.  On January 18, 2012, ORTEGA Sr. made an outgoing call to (209) 495-7328 (used

12  by McMILLIAN). During this call, McMILLIAN told ORTEGA Sr. that "they" stick out at the top

13  of the "cube" [22] and if he should press them down or just leave them. ORTEGA Sr. told

14  McMILLIAN if he presses them the roots will break. McMILLIAN stated that that the tops were

15  wet because he had just watered. ORTEGA Sr. asked if the one was still "flopped over."

16  McMILLIAN responded that he had seen two so far. ORTEGA Sr. stated that there had been about

17  "25" last night. I believe that McMILLIAN and ORTEGA Sr. discussed the health of the growing

18  marijuana plants. McMILLIAN told ORTEGA Sr. that he had spoken with "Shawn" [THOMPSON]

19  about cleaning the "trays." [23]

### 18.  Shawn THOMPSON

21      139.  Based on observations by law enforcement officers and intercepted calls, I believe

22  that THOMPSON is involved in the cultivation and distribution of multiple pounds of marijuana. I

23  believe that THOMPSON is partnered with ORTEGA Sr. and ERICKSON on the cultivation of

24  marijuana. Surveillance by law enforcement showed that THOMPSON resides at 849 Emily St.,

25  Mountain House, CA, located in the Eastern District of California. THOMPSON has the following

26  criminal convictions: a) in 1989, misdemeanor conviction for battery; b) in 1992, misdemeanor

27

28  22 A cube refers to a growing medium used in planting sapling marijuana plants.
   23 Trays are used to hold the pots that contain the marijuana plants and to all the marijuana plants to be watered evenly.

conviction for battery; c) in 1994, felony conviction for second degree robbery involving a firearm; d) in 1997, felony conviction for second degree robbery involving a firearm.

140.    The following is an intercepted call that details THOMPSON's involvement with ORTEGA Sr. in the cultivation of marijuana:

141.    On February 1, 2012, ORTEGA Sr. made an outgoing call to (925) 487-3939 (used by THOMPSON), ORTEGA Sr. asked THOMPSON how many of those things did they have excluding "Charley's" [ERICKSON]. THOMPSON asked if from him and ORTEGA Sr.  ORTEGA Sr. affirmed. ORTEGA Sr. asked if ORTEGA Sr. was supposed to have "eight," meaning eight pounds of marijuana. THOMPSON stated ORTEGA Sr. and THOMPSON should have "12," meaning 12 pounds of marijuana. ORTEGA Sr. told THOMPSON that ORTEGA Sr. and "Dusty" [BURGE] had taken "25" for a third party. I believe that ORTEGA Sr. told THOMPSON that ORTEGA Sr. and BURGE sold 25 pounds of marijuana to an unknown third party. THOMPSON stated that the next one was "11." THOMPSON stated that he had not calculated anything with "Charley's" yet. ORTEGA Sr. said he remembered that they had given "11" to the guy that got in trouble. I believe that ORTEGA Sr. and THOMPSON had been the source for the 11 pounds of marijuana that law enforcement seized on January 21, 2012.[24] I believe that in this call THOMPSON and ORTEGA Sr. discussed that from a harvest of 44 pounds of marijuana, they had eight pounds left. Also, I believe that ORTEGA Sr. and THOMPSON discussed that they had not included the marijuana that they had, which had been harvested from the partnership between THOMPSON, ORTEGA Sr. and ERICKSON. There are additional intercepted calls between THOMPSON and ORTEGA Sr. regarding the indoor marijuana cultivation site located at 2002 E. Home St.[25]

### 19.    Fredrick LAURENS

142.    Based on observations by law enforcement officers and intercepted calls, I believe that LAURENS is involved in the cultivation and distribution of multiple pounds of marijuana as

---

24 Additional information regarding the seizure of 11 pounds of marijuana on January 21, 2012, is located in paragraphs 52 through 56.

25 A separate section below describes the probable cause to search 2002 E Home St., Fresno, CA.

1  directed by ORTEGA Jr. Surveillance by law enforcement showed that LAURENS resides at 484

2  Richdale Court, Brentwood, CA located in the Northern District of California. LAURENS has the

3  following criminal convictions: a) misdemeanor conviction for reckless driving.

4      143.   The following intercepted calls detail LAURENS and ORTEGA Jr. involvement in

5  the cultivation and distribution of marijuana:

6      144.   On November 4, 2012, ORTEGA Jr. received an incoming call from (925) 872-8616

7  (used by LAURENS). During this call, LAURENS told ORTEGA Jr. that he just checked "them,"

8  believed to refer to the processed marijuana, and some were "448," and some were "453," believed

9  to refer to grams of weight. LAURENS asked if he should "even them all out." ORTEGA Jr.

10  replied, "We'll have to get some extra to put in them or something." I believe that LAURENS had

11  weighed the individual bags of processed marijuana that were supposed to contain a pound of

12  marijuana, but some needed more weight (note: 453.59 grams is equal to one pound).

13      145.   On November 11, 2012, ORTEGA Jr. made an outgoing call to (925) 872-8616 (used

14  by LAURENS). During this call, LAURENS told ORTEGA Jr. that they needed to get rid of some

15  of "that." ORTEGA Jr. told LAURENS that as soon as it was all done, ORTEGA Jr. would have

16  them come and get "it" all. LAURENS stated that there was "14," believed to be 14 pounds of

17  marijuana. ORTEGA Jr. asked if it was out of "both rooms." LAURENS said he was not done

18  "bagging," but he thought there was about "15," meaning 15 pounds of marijuana. ORTEGA Jr.

19  asked if "it was all dry." LAURENS replied that "it is ready to rock." I believe ORTEGA Jr. and

20  LAURENS discussed that LAURENS had just harvested between 14 and 15 pounds of marijuana

21  out of a one or two room indoor marijuana grow, which LAURENS wanted to get sold.

22      146.   On November 15, 2012, at approximately 10:25 a.m., ORTEGA Jr. made an outgoing

23  call to (925) 872-8616 (used by LAURENS). During this call, ORTEGA Jr. asked where

24  LAURENS was. LAURENS replied, "I'm at my house. We were just closing up all the bags so they

25  don't fucking shrink back more." ORTEGA Jr. said he only needed "one," likely to mean one pound

26  of marijuana, and he had "this guy" [buyer] waiting here for an hour. LAURENS said he would

27

28

come right now.  I believe this call refers to LAURENS bagging up of marijuana, possibly using shrink-wrap bags, for distribution by ORTEGA Jr.

147.    On that same day at approximately 11:13 a.m., surveillance observed LAURENS park a pickup in front of the **"Trendsetterz"** shop and carrying a bag inside.  I believe this bag likely contained the one pound marijuana sample ordered by ORTEGA Jr.

### 20.    Jason SIEGFRIED

148.    Based on observations by law enforcement officers and intercepted calls, I believe that SIEGFRIED is involved in the cultivation of multiple pounds of marijuana.  I believe that SIEGFRIED assists the Grower's Choice DTO, including ORTEGA Jr., by supplying members with cloned marijuana plants.  Surveillance by law enforcement showed that SIEGFRIED resides at **500 Ridge Creek Lane, Patterson, CA** located in the Eastern District of California.  SIEGFRIED does not have any known criminal convictions.

149.    The following intercepted calls detail SIEGFRIED's involvement in the cultivation of sapling marijuana plants for distribution to other marijuana cultivators:

150.    On January 20, 2012, ORTEGA Jr. made an outgoing call to (209) 914-6843 (used by SIEGFRIED).  During this call, ORTEGA Jr. asked SIEGFRIED if he could get "two-hun," likely to mean 200 sapling marijuana plants.  SIEGFRIED agreed and they discussed meeting in an hour at SIEGRIED's "shop."

151.    On January 29, 2012, ORTEGA Jr. made an outgoing call to (209) 914-6843 (used by SIEGFRIED).  During this call, ORTEGA Jr. asked if SIEGRIED's brother had "300 baby chickens" ("baby chickens" refers in this context to sapling marijuana plants).  SIEGRIED told ORTEGA Jr. "maybe."  ORTEGA Jr. told SIEGFRIED that he would stop by SIEGFRIED's house if  SIEGFRIED's brother] had "those."  SIEGFRIED asked ORTEGA Jr. how many of those things did ORTEGA Jr. want.  ORTEGA Jr. replied "three," likely 300 sapling marijuana plants. SIEGFRIED said no, the other ones.  ORTEGA Jr. stated that he usually gave the third party "16," possibly meaning 160 sapling marijuana plants, at a time.

1     152.    I believe ORTEGA Jr. wanted to purchase approximately 300 sapling marijuana

2  plants for himself and 160 sapling marijuana plants for an unidentified third party from SIEGFRIED

3  and SIEGFRIED's brother.

4                   **21.**    **Richard SERRELL**

5     153.    Based on observations by law enforcement officers and intercepted calls, I believe

6  that SERRELL is involved in the cultivation of multiple pounds of marijuana. I believe that

7  SERRELL assists ORTEGA Sr. and ORTEGA Jr. with the distribution of multiple pounds of

8  marijuana. Surveillance by law enforcement showed that SERRELL resides at 1700 Petit Peak

9  Court, Antioch, CA. SERRELL has the following criminal convictions: a) in 1987, misdemeanor

10  conviction for loiter where children are present; b) in 1989, misdemeanor conviction for reckless

11  driving; c) in 1990, misdemeanor conviction for carry concealed weapon on person; d) in 1991,

12  felony conviction for possession or purchase of cocaine base for sale and a felony conviction for

13  transport or sell narcotics or controlled substance .

14     154.    The following intercepted calls detail SERRELL's involvement in the cultivation of

15  marijuana and the advice SERRELL had gotten from GIARRUSSO and ORTEGA Jr. in growing

16  techniques:

17     155.    On January 18, 2012, GIARRUSSO made an outgoing call to (925) 470-0417 (used

18  by SERRELL). During this call, SERRELL asked GIARRUSSO if the can of "coco," a growing

19  medium, was the "cool one." GIARRUSSO affirmed. SERRELL asked GIARRUSSO how long he

20  should go for after "veg, ten weeks?" GIARRUSSO replied that it was "nine." SERRELL asked

21  GIARUSSO if he ever saw the "red-like veins that go up under the leaves?" GIARRUSSO told

22  SERRELL that it was "normal" for "OG," meaning a particular strain of marijuana. GIARRUSSO

23  stated that "OG" did that for the first couple of weeks. I believe GIARRUSSO and SERRELL

24  discussed the growing cycle prior to harvesting the marijuana. SERRELL asked GIARRUSSO if

25  GIARRUSSO's "did that too … red up under the leaves." SERRELL said that he had the same

26  "setup" as GIARRUSSO.

27     156.    I believe SERRELL had asked for advice from GIARRUSSO involving the

28

Affidavit of Rebecca Caceres          45

cultivation of marijuana. I believe that SERRELL may have had the assistance of GIARRUSSO to establish SERRELL's indoor marijuana growing operation, and it was similar to GIARRUSSO's indoor marijuana operation.

157.   On April 17, 2012, ORTEGA Jr. made an outgoing call to (925) 303-6376 (used by SERRELL). During this call, ORTEGA Jr. asked how SERRELL did. SERRELL told ORTEGA Jr. "19," meaning 19 pounds of marijuana. SERRELL explained that "it," had been doing "four and a half," meaning four and a half pounds of marijuana. ORTEGA Jr. said that before ORTEGA Jr. gave SERRELL some pointers, SERRELL's indoor marijuana operation had been producing "five" [five pounds of marijuana] and now SERRELL was getting "18," meaning 18 pounds of marijuana for the same amount of space. SERRELL told ORTETGA Jr. that "Jake" told SERRELL that if he puts "CO2", believed to refer to carbon dioxide, that "it" would be even better.

158.   I believe that SERRELL got advice from ORTEGA Jr., WESTERMAN, and GIARRUSSO on how to run his indoor marijuana operation more efficiently and the result was SERRELL harvested over three times more marijuana than before. I believe that members of this DTO assist each other in the cultivation of marijuana.

159.   The following intercepted call and surveillance details SERRELL's involvement in the purchasing of marijuana for future distribution:

160.   On April 26, 2012, ORTEGA Sr. made an outgoing call to (702) 619-0454 (used by SERRELL). During this call, ORTEGA Sr. told SERRELL that he found "40 of them," meaning 40 pounds of marijuana, if SERRELL wanted them. SERRELL asked if for "three," meaning $3,000 per pound. ORTEGA Sr. told SERRELL that he could have them for "29," meaning $2,900 per pound. ORTEGA Sr. told SERRELL that "Justin, the dude that works at the shop with the tattoos all over his head," referring to McMILLIAN, had them over "there," referring to "Trendsetterz". SERRELL stated that he would ride over there to take a look.

161.   I believe that ORTEGA Sr. told SERRELL that he had 40 pounds of marijuana to sell to SERRELL for $2,900 per pound. I believe that ORTEGA Sr. told SERRELL that McMILLIAN

1   had them at "**Trendsetterz**." I believe SERRELL told ORTEGA Sr. that he would go to

2   "**Trendsetterz**" to look at the marijuana.

3       162.   After the above referenced call, surveillance observed SERRELL park a Bentley

4   sedan in front of "**Trendsetterz**" and walk into the shop. A short time later, surveillance observed

5   SERRELL exit the shop, enter the Bentley, and drive away from the shop.

6       163.   After SERRELL was observed leaving "Trendsetterz," ORTEGA Sr. received an

7   incoming call from (209) 409-1163 (used by McMILLIAN). During this call, ORTEGA Sr. asked

8   McMILLIAN what "Richy Rich" [SERRELL] had said when he got there. McMILLIAN responded

9   that SERRELL had said "oh man 29, that's some really nice shit," meaning SERRELL liked the way

10  the marijuana looked. However, McMILLIAN continued that SERRELL had complained about the

11  marijuana being "2,900 bucks". I believe SERRELL had complained about the price to

12  McMILLIAN trying to get McMILLIAN to drop the price. McMILLIAN had told SERRELL that

13  he was putting a "buck," meaning $100 per pound, on it because that was what McMILLIAN

14  needed. I believe that McMILLIAN had told SERRELL that McMILLIAN was only making $100

15  per pound off marijuana that McMILLIAN sold and would not lower the price.

16      164.   Based on the above conversation and surveillance, I believe that SERRELL went to

17  "**Trendsetterz**" to look at the marijuana. However, I believe that SERRELL did not purchase any of

18  the marijuana because he did not want to pay $2,900 per pound. Prior to these intercepted calls,

19  there have been other intercepted calls where SERRELL likely purchased multiple pounds of

20  marijuana from members of the GROWERS CHOICE DTO.

21      165.   Based on observations by surveillance and the above intercepted calls with

22  SERRELL, I believe SERRELL, ORTEGA Sr., ORTEGA Jr., and GIARRUSSO work together in

23  the distribution and cultivation of marijuana. I checked the telephone tolls for the telephone

24  SERRELL was intercepted and noticed he is in recent contact with Matt ORTEGA, GIARRUSSO,

25  ORTEGA Sr., McMILLIAN and HETRICK. The follow are the number of contacts from March 29,

26  2012 through April 25, 2012: Matt ORTEGA (211 contacts), GIARRUSSO (160 contacts),

27  ORTEGA Sr (eight contacts), McMILLIAN (eight contacts), and HETRICK (seven contacts).

28

## 22.   **Kevin KUESTER**

166.    Based on observations by law enforcement officers and intercepted calls, I believe that Kevin KUESTER is involved in the cultivation of sapling marijuana plants that he distributes to members of the ORTEGA Organization, including ORTEGA Sr., ORTEGA Jr., DUPEE and others. Surveillance by law enforcement showed that KUESTER resides at 34388 Auckland Ct., Fremont, CA. KUESTER has the following criminal convictions: a) in 1990, misdemeanor conviction for DUI alcohol or drugs.

167.    The following intercepted calls detail KUESTERS involvement in the distribution of sapling marijuana plants for other indoor marijuana growers to include ORTEGA Sr. and ORTEGA Jr.:

168.    On January 31, 2012, ORTEGA Jr. made an outgoing call to (510) 673-2708 (used by KUESTER). During this call, KUESTER stated that he could give ORTEGA Jr. "seven," likely meaning 700 sapling marijuana plants, in a week. ORTEGA Jr. said that he wanted "six" for this week and "800" more as soon as possible. KUESTER told ORTEGA Jr. "I don't get to cut any for a week, so that would be three weeks and you'd be the first person in line."

169.    I believe ORTEGA Jr. ordered approximately 600 sapling marijuana plants from KUESTER that would be ready for pickup in a week's time and 800 additional sapling marijuana plants that would be ready in three weeks. The sapling marijuana plants are then replanted in bigger pots to be grown to maturity where they will produce "buds" that will later be harvested and sold.

170.    On February 3, 2012, ORTEGA Sr. made an outgoing call to (510) 673-2708 (used by KUESTER). During this call, ORTEGA Sr. told KUESTER that "he" [unknown third party] would meet KUESTER at 11:00 a.m., "but get in and get out cause I tell you now I know for a fact they are watching my Tracy store." ORTEGA Sr. continued that "I know they're not watching San Leandro yet, but it's probably next."

171.    On February 4, 2012, at approximately 10:41 a.m., surveillance observed a black Cadillac Escalade driven by THOMPSON park in the parking lot at the "Growers Choice" in Hayward, CA. At approximately 10:50 a.m., surveillance observed a white panel van driven by

1  Kevin KUESTER leave KUESTER's residence located at 34388 Auckland Ct., Fremont, CA. At

2  approximately 11:05 a.m., surveillance observed KUESTER park his van next to THOMPSON's

3  Escalade. KUESTER and THOMPSON were seen talking outside their vehicles for a short time

4  before walking into the "Growers Choice" store. At approximately 11:23 a.m., surveillance

5  observed THOMPSON and KUESTER exit the store and approach their vehicles. A short time later,

6  approximately two large brown cardboard boxes were moved from KUESTER's van to

7  THOMPSON's Escalade. After THOMPSON's Escalade was loaded, surveillance followed

8  THOMPSON to 849 Emily St., Mountain House, CA, which at the time had been an indoor growing

9  operation.

10      172.   I believe ORTEGA Sr. previously ordered an undetermined amount of sapling

11  marijuana plants from KUESTER, which KUESTER notified ORTEGA Sr. were ready for pickup. I

12  believe ORTEGA Sr. directed THOMPSON to pick up the sapling marijuana plants from KUESTER

13  and deliver them to an indoor growing operation located at 849 Emily St., Mountain House, CA.

14  Also, I believe that ORTEGA Sr. warned KUESTER that ORTEGA Sr. received information that

15  law enforcement was watching the "Growers Choice" store in Tracy, CA but not the store located in

16  Hayward, CA [previously located in San Leandro, CA].

17      173.   On April 4, 2012, ORTEGA Jr. made an outgoing call to (510) 673-2708 (used by

18  Kevin KUESTER). During this call, ORTEGA Jr. asked KUESTER if he had any leftovers.

19  KUESTER told ORTEGA Jr. no because some had died off and did not know what was going on.

20  KUESTER explained that he was losing about "400," likely meaning 400 sapling marijuana plants,

21  every time in a "cut." ORTEGA Jr. asked "what were they doing; are they just falling over or

22  yellowing out." KUESTER replied "they are just falling over." ORTEGA Jr. asked if the ones that

23  were dying were coming off the same "mom," meaning mother marijuana plant. KUESTER stated

24  that he did not know. KUESTER said that the batch he was on was doing better than previous ones.

25  KUESTER explained to ORTEGA Jr. that if there was any leftover after ORTEGA Jr.'s "dad"

26  picked up "his" then ORTEGA Jr. could take those.

27      174.   I believe that ORTEGA Jr. wanted to order sapling marijuana plants from KUESTER.

28

1  However, KUESTER explained that he was having problems with the health of the sapling

2  marijuana plants that he had been "cloning" for distribution. I believe KUESTER told ORTEGA Jr.

3  that he could have any leftover sapling marijuana plants that ORTEGA Sr. did not purchase.

4       175. On January 17, 2012, there was an intercepted call between DUPEE and ORTEGA

5  Sr. where they discussed ordering cloned sapling marijuana plants from KUESTER, which based on

6  surveillance, were picked up at the Growers Choice in Hayward, CA.[26] Based on the intercepted

7  calls and surveillance, I believe that KUESTER participates as the supplier of cloned sapling

8  marijuana plants for the GROWERS CHOICE DTO, including ORTEGA Sr., ORTEGA Jr., and

9  DUPEE.

10       **23.**   **Derek WINTERS**

11       176. Based on observations by law enforcement officers and intercepted calls, I believe

12  that Derek WINTERS is involved in the cultivation and distribution of marijuana and the laundering

13  of the marijuana proceeds for the Grower's Choice DTO. Derek WINTERS is the manager for

14  Growers Choice in Tracy, CA. Surveillance by law enforcement showed that Derek WINTERS

15  resides at 9301 Morton Davis Dr., Patterson, CA, which is located in the Eastern District of

16  California. Derek WINTERS does not have any known criminal convictions.

17       177. The following intercepted call details Derek WINTERS and Marla ORTEGA's

18  knowledge about the difference between drug proceeds and legitimate money and detection of the

19  drug proceeds:

20       178. On April 10, 2012, Marla ORTEGA received an incoming call from (209) 450-6246

21  (used by Derek WINTERS). During this call, Derek WINTERS told Marla ORTEGA that he

22  received "12 grand" [$12,000] from his tax return. Marla ORTEGA told Derek WINTERS that he

23  should put it in a savings account or at least part of it. Derek WINTERS responded that he would

24  take it to work tomorrow. Marla ORTEGA stated that Derek WINTERS should "put all of it

25  actually ... you know why ... cause that's good money and you still have all that other money."

26

27

28  26 Additional information regarding the distribution of cloned plants to ORTEGA Sr. and DUPEE by KUESTER is
located in paragraphs 75 through 78.

179.    I believe that Derek WINTERS was going to use the "Growers Choice" in Tracy, CA to launder the money that he received from the IRS as he would normally launder his drug proceeds. I believe that Marla ORTEGA explained to Derek WINTERS that he should save the $12,000 of legitimate money in a bank instead of laundering it.

180.    The following intercepted calls detail Derek WINTERS' involvement in the cultivation and distribution of marijuana:

182.    On January 15, 2012, there was an intercepted call between GIARRUSSO and ORTEGA Sr., which discussed the partnership between BECERRA and Derek WINTERS in the cultivation of marijuana.[27]

183.    On April 12, 2012, Marla ORTEGA made an outgoing call to (209) 450-6246 (used by Derek WINTERS). During this call, Derek WINTERS stated that he was working in Patterson, CA. Marla ORTEGA asked Derek WINTERS if he was going to do his phone. Derek WINTERS responded that he would do it next Saturday when he worked next because he might be busy working out there the next three days.

184.    I believe that Derek WINTERS told Marla ORTEGA that he was "working" at an indoor marijuana cultivation site for the next three days and would not be able to run an errand until Saturday when he "worked" at "Growers Choice" in Tracy, CA.

185.    On April 17, 2012, ORTEGA Sr. made and received incoming and outgoing calls to and from (209) 450-6246 (used by Derek WINTERS). During this call, ORTEGA Sr. told Derek WINTERS to do whatever he wanted to do with her, but not to say anything to her or let her in on anything. I believe ORTEGA Sr. instructed Derek WINTERS not to provide information to a female about their marijuana cultivation and distribution operations. Derek WINTERS stated that she is already asking about "weight," meaning quantities of marijuana, and "slinging," meaning distribution of marijuana. ORTEGA Sr. explained that there was a "bitch going around trying to get weight, then buying weight, got popped in our area right here." ORTEGA Sr. continued that his "fed buddy" told him that morning that the girl was "rolling." ORTEGA said that the unidentified

---

27 Additional information is contained in paragraphs 88 through 93 that describes Derek WINTERS' partnership with BECERRA in cultivating marijuana.

female "gave up her case to get all of us." I believe ORTEGA Sr. told Derek WINTERS that a third party connected to law enforcement told ORTEGA Sr. that a female informant had provided details about the ORTEGA Organization's cultivation and distribution of marijuana. ORTEGA Sr. stated that she has been asking him [THOMPSON] that her "buddy wants 50," likely 50 pounds of marijuana. ORTEGA Sr. called Derek WINTERS back and told him that they [unknown] had gotten other calls right about her currently trying to get rid of "five of them," meaning five pounds of marijuana and asked if "they," meaning the five pounds of marijuana, were Derek WINTERS.' Derek WINTERS replied no. I believe that ORTEGA Sr. was concerned that Derek WINTERS had sold or provided five pounds of marijuana to the female ORTEGA Sr. believed to be an informant for law enforcement.

### 24.  **Richard REYNOLDS**

186.    Based on observations by law enforcement officers and intercepted calls, I believe that Richard REYNOLDS is involved in the distribution of marijuana for ORTEGA Sr.  Surveillance by law enforcement showed that REYNOLDS resides at 1800 La Corunna Place, Apartment A, Modesto, CA.  REYNOLDS does not have any known criminal history.

187.    The following intercepted calls involve Richard REYNOLDS brokering the sale of approximately ten pounds of marijuana for ORTEGA Sr. with a buyer in the area of Los Angeles, CA:

188.    On January 28, 2012, ORTEGA Sr. made an outgoing call to (209) 321-1685 (used by REYNOLDS). During this call, REYNOLDS asked ORTEGA Sr. if he had "work," likely referring to marijuana to sell. ORTEGA Sr. asked REYNOLDS what he wanted. REYNOLDS responded "a couple of them," meaning a couple pounds of marijuana. ORTEGA Sr. asked REYNOLDS "what are you going to pay?" REYNOLDS stated "three," meaning $3,000, and asked if ORTEGA Sr. would give it to REYNOLDS for a week. I believe REYNOLDS wanted ORTEGA Sr. to front the marijuana, and suggested REYNOLDS would pay ORTEGA Sr. back in a week. ORTEGA Sr. told REYNOLDS "I don't want to give them out without cash." REYNOLDS explained "it was a good deal, so it was up to you." REYNOLDS told ORTEGA Sr. he could take

1  "ten," likely ten pounds of marijuana. REYNOLDS and ORTEGA Sr. continued to barter the price
2  per pound of marijuana.

3       189.  On January 30, 2012, ORTEGA Sr. made an outgoing call to (209) 321-1685 (used
4  by Richard REYNOLDS). During this call, REYNOLDS told ORTEGA Sr. that tomorrow he
5  would be at ORTEGA Sr.'s residence to get "them," meaning pound quantities of marijuana.
6  ORTEGA acknowledged. Reynolds asked ORTEGA Sr. if ORTEGA Sr. could put them in that big
7  "Tupperware thing" and clean it out so it did not stink. ORTEGA Sr. asked REYNOLDS "did you
8  peel all that shit off your windows?" REYNOLDS asked why he was taking the tint off of the
9  windows. ORTEGA Sr. explained that "tint was bad" because six days ago "they" left ORTEGA Sr.
10  and went on "Vasco" [Vasco Road] and "that's exactly what they got pulled over for." I believe
11  ORTEGA Sr. told REYNOLDS about BASRA and HAPTE's arrest that occurred on January 21,
12  2012, which was initiated by a traffic stop due to the front windows being tinted. Then, ORTEGA
13  Sr. spoke to unknown third party in the background that he needed "15," likely meaning 15 pounds
14  of marijuana, in that bundle. REYNOLDS asked ORTEGA Sr. if he had any "ozone things, the
15  smell good things." I believe REYNOLDS asked ORTEGA Sr. if he had any air fresheners to mask
16  the smell of marijuana. ORTEGA Sr. told REYNOLDS he did not. REYNOLDS responded that he
17  was not "tripping" on that because they were not doing anything wrong. REYNOLDS said he was
18  "riding" to LA and coming back. I believe that REYNOLDS will take the marijuana from ORTEGA
19  Sr., drive it to a buyer in LA, and return with ORTEGA Sr.'s money. ORTEGA Sr. told
20  REYNOLDS that ORTEGA Sr. puts "them" in a "big garbage bag" and throws them in the back.
21  ORTEGA Sr. stated sarcastically that he "didn't know how they got there." I believe that ORTEGA
22  Sr. told REYNOLDS that he puts the marijuana in garbage bags in the bed of his pickup, and if
23  ORTEGA Sr. were to be questioned by law enforcement or someone else about the marijuana,
24  ORTEGA Sr. would deny knowledge about the marijuana. It should also be noted that the marijuana
25  seized from BASRA and HAPTE had been contained in a large black garbage bag.

26       190.  On February 1, 2012, ORTEGA Sr. made two outgoing calls to (209) 321-1685 (used
27  by REYNOLDS). During these calls, REYNOLDS told ORTEGA Sr. that he just came back from

28

1  "there," referring to Los Angeles, CA.  REYNOLDS explained that he had gone down there and

2  returned home then "he" [unidentified buyer of marijuana] called REYNOLDS  again and wanted

3  more so REYNOLDS went back to Los Angeles, CA for a second time and returned.  REYNOLDS

4  continued that he was going got have to do it again on Friday.  I believe, that in this conversation,

5  REYNOLDS told ORTEGA Sr. that he had made two trips down to Los Angeles, CA to deliver

6  marijuana, which one load had been supplied by ORTEGA Sr.  I believe that REYNOLDS was

7  planning on taking a third trip to Los Angeles, CA on Friday, February 3, 2012, to deliver more

8  marijuana.  A few hours later, ORTEGA called REYNOLDS back and told him they would meet at

9  the Burger King right off Kiernan.

10       191.    On that same date, surveillance followed ORTEGA Sr. from "Growers Choice" in

11  Tracy, CA to Burger King, 4612 Kiernan Ave., Salida, CA.  At approximately 2:53 p.m.,

12  surveillance observed REYNOLDS, driving a white Trailblazer SUV, park next to ORTEGA Sr.'s

13  vehicle.  Then, surveillance observed REYNOLDS exit his vehicle and remove a black duffel bag

14  from the back seat.  REYNOLDS was seen walking up to the driver's side of ORTEGA Sr.'s truck

15  and showing ORTEGA Sr. the contents of the bag before placing the duffle in the back of ORTEGA

16  Sr.'s truck.

17       192.    I believe that on January 30, 2012, REYNOLDS brokered between 10 and 15 pounds

18  of marijuana supplied by ORTEGA Sr. with an unknown buyer located in Los Angeles, CA.  I

19  believe on February 1, 2012, surveillance observed REYNOLDS provide ORTEGA Sr. with a duffel

20  bag that contained the proceeds from the sale of the marijuana.  Based on additional intercepted

21  calls, REYNOLDS has brokered the sale of multiple pounds of marijuana on numerous occasions for

22  ORTEGA Sr.

23                    **25.    Nickolas PERRY**

24       193.    Based on observations by law enforcement officers and intercepted calls, I believe

25  that Nickolas PERRY is involved in the cultivation and distribution of marijuana.  I believe that

26  PERRY assists the Grower's Choice DTO, to including ORTEGA Jr., by distributing cloned

27  marijuana plants to DTO members to be planted in the DTO's indoor marijuana cultivation sites.

28

Affidavit of Rebecca Caceres                    54

1   PERRY has the following criminal conviction: a) in 2010, misdemeanor conviction for reckless
2   driving.

3      194.    I believe that 3965 Regatta Dr., Discovery Bay, CA, located in the Northern District
4   of California, is the primary residence and a likely marijuana cultivation site of Nickolas PERRY. I
5   believe that ORTEGA Sr. is the owner of 3965 Regatta Dr. PERRY's associated vehicles have been
6   observed at 3965 Regatta Dr. throughout the investigation. CS#2 believed PERRY is a partner or
7   DTO member. Further, CS#2 stated that ORTEGA Sr. is aware that PERRY is growing marijuana
8   inside this residence, but ORTEGA Sr. was not pleased because ORTEGA Sr. is the owner of the
9   residence.

10     195.    The following intercepted calls detail PERRY's involvement in cultivating and
11  distributing sapling marijuana plants to other indoor marijuana cultivators to include ORTEGA Jr.:

12     196.    On April 10, 2012, ORTEGA Jr. made an outgoing call to (925) 234-2800 (used by
13  PERRY). During this call, ORTEGA Jr. asked PERRY if PERRY really did not know anyone that
14  had at least "200" of "them," likely meaning sapling marijuana plants, and that ORTEGA Jr. would
15  pay "$10" [28] each for them. PERRY told ORTEGA Jr. that last time they spoke ORTEGA Jr.
16  wanted a "G," meaning 1,000 sapling marijuana plants. I believe ORTEGA Jr. asked PERRY if
17  PERRY knew anyone that he could purchase at least 200 sapling marijuana plants. I believe that
18  PERRY questioned ORTEGA Jr. about wanting only 200 sapling marijuana plants when ORTEGA
19  Jr. asked PERRY on a previous occasion for 1,000. ORTEGA Jr. told PERRY that he really needed
20  "1400," meaning sapling marijuana plants, but ORTEGA Jr. could use "two," "two," "two" and
21  "two" and then needed "800" for one. I believe that ORTEGA Jr. told PERRY that ORTEGA Jr.
22  needed 200 marijuana plants to plant in four different indoor growing operations and 800 marijuana
23  sapling marijuana plants in a fifth indoor growing operation.

24     197.    On April 20, 2012, ORTEGA Jr. made an outgoing call to (925) 234-2800 (used by
25  PERRY). During this call, PERRY told ORTEGA Jr. that he was "making babies," meaning sapling
26  marijuana plants. ORTEGA Jr. asked PERRY if ORTEGA Jr. would get his yet. PERRY told

27

28  28 The ORTEGA DTO had consistently been paying between $6 and $8 for sapling marijuana plants.

ORTEGA Jr. that he had "200," referring to sapling marijuana plants ready for ORTEGA Jr. ORTEGA Jr. told PERRY that he needed "800" . PERRY told ORTEGA Jr. that he was doing them. ORTEGA Jr. complained that he thought PERRY had "them" [sapling marijuana plants] done months ago. PERRY told ORTEGA Jr. that PERRY needed them too, and PERRY had told ORTEGA Jr. that he would try to give ORTEGA Jr. everything PERRY had.

198.    I believe ORTEGA Jr. had ordered 800 sapling marijuana plants from PERRY on an earlier occasion. I believe that PERRY told ORTEGA Jr. that PERRY had 200 sapling marijuana plants ready for ORTEGA Jr. to pickup. I believe that ORTEGA Jr. complained about not getting the plants earlier. I believe that PERRY told ORTEGA Jr. that PERRY needed the sapling marijuana plants for PERRY's indoor growing operation before PERRY made some for ORTEGA Jr.

199.    On April 23, 2012, ORTEGA Jr. made an outgoing call to (925) 234-2800 (used by PERRY). During this call, ORTEGA Jr. told PERRY that he needed "800 kids," meaning 800 sapling marijuana plants. PERRY stated that five days from the 15th he had cut "19 flat," meaning 1,900 sapling marijuana plants. ORTEGA Jr. asked PERRY if he could get "800" from those. PERRY agreed.

200.    Based on the previously mentioned calls, I believe that ORTEGA Jr. still needed 800 sapling marijuana plants and wanted to purchase some from PERRY. I believe that PERRY explained to ORTEGA Jr. that he had recently cut 1,900 sapling marijuana plants and agreed to give ORTEGA Jr. 800 plants from the 1,900 plants PERRY harvested.

201.    Based on the intercepted calls, I believe that PERRY assists the GROWERS CHOICE DTO by providing cloned sapling marijuana plants to its members, including ORTEGA Jr. I checked the telephone tolls for the telephone PERRY was intercepted using and noticed he has been in contact between October 2011 and April 26, 2012, with the following DTO members:  Matt ORTEGA (232 contacts), FIGLIA (155 contacts), Marla ORTEGA (127 contacts), ADGATE (68 contacts), SIEGFRIED (23 contacts), DUPEE (16 contacts), ORTEGA Jr. (11 contacts), Anthony WINTERS (6 contacts), and ORTEGA Sr. (6 contacts).

1

### 26.  Joseph MIRANTE

2   202.   Based on observations by law enforcement officers and intercepted calls, I believe

3   that Joseph MIRANTE is involved in the cultivation and distribution of marijuana. I believe that

4   MIRANTE assists the Grower's Choice DTO, including ORTEGA Jr., in the distribution of cloned

5   marijuana plants to be planted in indoor cultivation locations. I believe that MIRANTE may also

6   assist members of the Grower's Choice DTO, including ORTEGA Sr., in the distribution of

7   marijuana. Surveillance by law enforcement showed that MIRANTE resides at 2894 Funston,

8   Tracy, CA, located in the Eastern District of California. MIRANTE has the following criminal

9   conviction: a) 1991, misdemeanor conviction for theft of personal property.

10   203.   The following is an intercepted call that details MIRANTE's involvement in the

11   distribution of sapling marijuana plants for other indoor marijuana growers including ORTEGA Jr.:

12   204.   On October 31, 2011, ORTEGA Jr. made an outgoing call to (209) 649-2662 (used

13   by MIRANTE). During this call, ORTEGA Jr. asked MIRANTE if he could get any "Abes,"

14   possibly slang for sapling marijuana plants. MIRANTE affirmed. ORTEGA Jr. asked what kind.

15   MIRANTE replied "OG," meaning the name for a particular strain of marijuana. ORTEGA Jr.

16   asked how many he could get. MIRANTE explained that they were not rooted and had to be

17   chopped. ORTEGA explained that he needed them "rooted." ORTEGA Jr. said that he would take

18   anything from "two hun to six hun," meaning 200 to 600 sapling marijuana plants. I believe

19   ORTEGA Jr. ordered 200 to 600 sapling marijuana plants with a root system from MIRANTE.

20   205.   The following is an intercepted call that details MIRANTE's involvement in the

21   purchasing for future distribution of marijuana:

22   206.   On January 13, 2012, ORTEGA Sr. made an outgoing call to (209) 649-2662 (used

23   by MIRANTE). During this call, ORTEGA Sr. told MIRANTE that ORTEGA Sr. could make

24   MIRANTE a good deal for "ten of them for 28," meaning ten pounds of marijuana for $2,800 per

25   pound. MIRANTE told ORTEGA Sr. that he would call ORTEGA Sr. back and let him know either

26   way. I believe ORTEGA Sr. offered to sell MIRANTE ten pounds of marijuana for $2,800 per

27   pound.

28